WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Carl Cuagliotti,

        Plaintiff,

v.

City of Mesa,

        Defendant.

No. CV-24-02970-PHX-DWL

**ORDER**

The City of Mesa ("City") has enacted municipal ordinances that prohibit camping in City parks and on City property.  In this action, Carl Cuagliotti ("Plaintiff"), who is proceeding *pro se*, asserts an array of constitutional challenges to those ordinances, arguing that they (1) violate his Fourteenth Amendment substantive due process rights to "autonomy in making personal life choices," to sleep, and "to determine where and how to live"; (2) result in coercion that amounts to an "unlawful seizure" in violation of the Fourth Amendment; (3) violate his Fourteenth Amendment substantive due process rights to "intrastate travel" and to be free from "constructive banishment"; (4) violate his Fourteenth Amendment right to procedural due process; and (5) are unconstitutionally vague.

Now pending before the Court are the City's motion to dismiss (Doc. 25) and Plaintiff's motion for leave to file a surreply (Doc. 32).  Those motions are fully briefed and neither side requested oral argument.  For the reasons that follow, the City's motion is granted and Plaintiff's motion is denied.

…

## BACKGROUND

I.    Factual Allegations

The following facts, presumed true, are derived from Plaintiff's operative pleading, the Second Amended Complaint ("SAC").  (Doc. 15.)

### A.    Plaintiff's Housing Status

"Plaintiff is a resident of Arizona" who "regularly utilizes public parks in Mesa, Arizona, as a place for resting and recuperating after working long hours.  Preferring to save his financial resources for future needs rather than spending on rent, Plaintiff lives a minimalistic lifestyle that involves responsible use of public spaces."  (*Id.* ¶¶ 8, 33.)

### B.    October 2024 Incident

In October 2024, "Plaintiff was approached by two armed rangers while sleeping in a park."  (*Id.* ¶ 34.)  One of those rangers woke up Plaintiff and stated: "[Y]ou have to remain upright.  You cannot lay down or sleep in the park."  (*Id.*)  The ranger then "asked if Plaintiff was homeless and offered Plaintiff to call a [Community Bridges] navigator or Phoenix rescue mission."  (*Id.*)  "Plaintiff refused the offer," and the ranger replied by stating: "[T]hen I don't want to see you laying down again or you will get a ticket."  (*Id.*)  "After the rangers left, Plaintiff left the park for fear of further harassment from the rangers."  (*Id.*)

### C.    November 2024 Incident

On November 2, 2024, "Plaintiff was approached by a representative from a local shelter, who offered him shelter services."  (*Id.* ¶ 35.)  "Plaintiff, not in need of or desiring such services, formally requested that the shelter representative and Phoenix Rescue Mission refrain from approaching him in the future."  (*Id.*)  Plaintiff "explicitly informed the representative that any further approach would warrant a request for a restraining order."  (*Id.*)

"Approximately fifteen minutes after this encounter, Plaintiff was approached by two armed park rangers who accused him of violating Mesa City Code (MCC) § 6-10-4(V) by allegedly 'storing personal belongings' in the park due to the presence of his

backpacks." (*Id.* ¶ 36.) Plaintiff then "explained" to the rangers "that he had only recently arrived at the park and had no intention of using it as a place for 'storing personal belongings.'" (*Id.*) "Despite this explanation, the park rangers dismissed [Plaintiff's] statements, asserting that 'storing personal belongings' constituted a violation, regardless of the short duration he had been present." (*Id.*) "The armed park rangers told [P]laintiff that having just one or two backpacks would be alright, but since he had more than that, it constituted a violation of the ordinance," and the park rangers further "threatened to issue a citation if Plaintiff did not comply with their directive to reduce the number of bags he was carrying." (*Id.* ¶¶ 36-37.) "Afterwards, both rangers adopted an aggressive tone and implied that further noncompliance would lead to Plaintiff's expulsion from the park and/or a criminal citation." (*Id.* ¶ 38.) Plaintiff then asked the rangers "why he was being singled out while others in the park were not questioned," to which "the rangers responded that others were 'recreating,' implicitly suggesting that Plaintiff's presence was unwelcome based on the appearance of his backpacks." (*Id.* ¶ 39.)

During this encounter, one of the rangers further "displayed a discriminatory attitude by stating, 'When one homeless person is present, they all start congregating,'" although Plaintiff "clarif[ied] that he neither associates with others nor forms any gatherings in the park." (*Id.* ¶ 40.) The rangers also "falsely accused Plaintiff of being someone they had previously warned in another park, attempting to misidentify him as a repeat offender despite Plaintiff's assertions to the contrary." (*Id.* ¶ 41.)

Ultimately, "the first ranger explicitly warned that if Plaintiff did not comply, he would be banished from the park and/or cited under MCC 6-10-4(V) for the number of bags he had." (*Id.* ¶ 42.) "Faced with the imminent threat of citation or expulsion, Plaintiff had no real choice but to comply, doing so under duress." (*Id.*) "As a direct result of this encounter, Plaintiff avoided the park for several months, fearing further enforcement actions." (*Id.* ¶ 43.)

D.    **April 2025 Incident**

On April 13, 2025, "Plaintiff was seated at a picnic table in a public park within the

City of Mesa, with some backpacks and grocery bags placed near him and on the table." (*Id.* ¶ 44.) "Plaintiff was not camping, nor was he storing items unattended," but instead "was merely resting in the park with his personal belongings in his immediate possession." (*Id.*) "Mesa park rangers approached Plaintiff and instructed him to consolidate his bags, asserting that having them spread out on the table constituted 'storing personal belongings' in violation of [MCC] § 6-10-4(V)." (*Id.* ¶ 45.) Plaintiff responded by "explain[ing] that he was not 'storing' items within the ordinary or legal meaning of the term" because, in Plaintiff's view, "'storing' implies leaving possessions behind and returning later to retrieve them, which was not the case." (*Id.*) In response, "one of the rangers insisted that the number and placement of bags constituted a violation." (*Id.* ¶ 46.) "Another ranger then inquired whether Plaintiff was homeless," and "[u]pon Plaintiff's affirmative response, the ranger attempted to offer services from Phoenix Rescue Mission and other outreach programs." (*Id.*) "Plaintiff declined these services and clearly stated that he was not interested in shelter or programmatic intervention." (*Id.* ¶ 47.) "In response, the ranger repeated the demand that Plaintiff move his bags closer together and stated, 'So are you going to put your bags closer together or do you want a citation?'" (*Id.* ¶ 48.) "When Plaintiff stood firm . . . , the ranger issued Plaintiff a criminal citation for alleged 'urban camping' under MCC § 6-10-4(V)." (*Id. See also* Doc. 15-2 [copy of citation attached to the SAC].)[1] "Plaintiff was then informed by the ranger that he was being expulsed from the park and could not return until after his scheduled court date." (Doc. 15 ¶ 49.)

II.    <u>The Challenged Ordinances</u>

Plaintiff challenges the constitutionality of three City ordinances ("the Challenged Ordinances"), excerpted here.

A.    **MCC § 6-10-4(V) ("Public Park Regulations—Prohibited Activities and Restrictions")**

It is a violation of this Chapter for a person in a park to engage in any of the prohibited activities or to violate any of the restrictions set forth in this

---

[1]    The Court notes that MCC § 6-10-4(V) is the ordinance that prohibits camping in parks, whereas MCC § 6-1-23 is the ordinance that prohibits "urban camping."

Section, unless otherwise allowed pursuant to the Subsections below:

…

(V)    Camping.  No person shall camp, establish or maintain camping facilities, or use or store camping paraphernalia in a city park or adjacent right-of-way.

    (1)    This Section does not apply to:

        (A)    Temporary structures or camps set up by a government agency or relief workers during a disaster or emergency situation.

        (B)    Activities approved by the Director or city that receive a special event license, special use permit, or other permit or permission.

    (2)    If any camping paraphernalia or item used for camping is left unattended or abandoned in a park, the City may confiscate and discard the item in accordance with applicable law.

    (3)    Nothing in this Subsection is intended to interfere with otherwise lawful and ordinary uses of park property or adjacent right-of-way.

B.    **MCC § 6-10-2 ("Public Park Regulations—Definitions")**

The terms of this Chapter have the below meanings, whether or not the term is capitalized, unless the context requires otherwise.  Words in the present tense include the future tense, words in the plural number include the singular number, and words in the singular number include the plural number.  Definitions set forth in this Section apply only to this Chapter and do not affect and are not to be applied to any other Mesa City Code.

…

CAMP or CAMPING: means to establish temporary or permanent living accommodations in a park or adjacent right-of-way.  Indications of camping include laying down bedding, using camp paraphernalia, erecting temporary structures for shelter, sleeping, storing personal belongings, burning a fire, cooking or preparing food, living in a parked motor or recreational vehicle, or remaining for prolonged or repetitious periods of time in a manner not associated with ordinary recreational use of a park.  An activity shall constitute camping when it reasonably appears, in light of all the circumstances, the person, in conducting the activity, are in fact using the area for the purpose of living accommodations, regardless of the intent of the participants or the nature of any other activities in which they may also be engaging.  For the purposes of clarity, the term "camp" or "camping" in this

Chapter 10 does not refer to the mere use of city-installed cooking facilities or equipment, the possession or transportation of camping paraphernalia, or the use of a blanket for resting absent other evidence of living accommodations.

CAMPING PARAPHERNALIA: means any accessory, equipment, or item commonly used to assist someone to camp, including tarpaulins, cots, beds, bedding, sleeping bags, hammocks, tents, blankets, and cooking equipment.

. . .

STORE: means to put aside or accumulate for use when needed, to put for safekeeping, to place or leave in a location.

C.   **MCC § 6-1-23 ("General Offenses—Urban Camping")**[2]

(A)   The use of City property for camping purposes or storage of personal property without the express permission of the City interferes with the rights of others to use the areas for which they were intended and can constitute a public health and safety hazard that adversely impacts surrounding property.  The purpose of this section is to maintain City property in a clean, sanitary and accessible condition, and to adequately protect the health, safety, and welfare of the community, while recognizing that certain temporary camping associated with emergencies or special events or activities can be beneficial.  Nothing in this Section is intended to interfere with otherwise lawful and ordinary uses of public property.

(B)   The definitions contained in this Subsection (B) shall only govern the construction, meaning, and application of words and phrases used in this Section.

"CAMP" or "CAMPING": means to establish temporary or permanent living accommodations on City Property.  Indications of camping include laying down bedding, using camp paraphernalia, erecting temporary structures for shelter, sleeping, storing personal belongings, burning a fire, cooking or preparing food, or living in a parked motor or recreational vehicle.  An activity shall constitute camping when it reasonably appears, in light of all the circumstances, the person, in conducting the activity, are in fact using the area for the purpose of living accommodations, regardless of the intent of the participants or the nature of any other activities in which they may also be engaging.  For the purposes of clarity, the term "Camp" or "Camping" in this Section does not refer to the mere possession or

---

[2]   This provision was enacted via Ordinance No. 5892.  The SAC refers to it by this ordinance number.

transportation of Camping Paraphernalia, or the use of a blanket for resting, absent other evidence of living accommodations.

CAMPING PARAPHERNALIA: any accessory, equipment, or item commonly used to assist someone to camp, including tarpaulins, cots, beds, bedding, sleeping bags, hammocks, tents, blankets, and cooking equipment.

. . .

STORE: means to put aside or accumulate for use when needed, to put for safekeeping, to place or leave in a location.

(C)   It is unlawful for any person on City property to camp, establish or maintain camping facilities, or use or store camping paraphernalia.

(D)   This section does not apply to:

(1)   Camping or activities in a park which is governed by Mesa City Code Title 6, Chapter 10.

(2)   Temporary structures or camps set up by government agency or relief workers during a disaster or emergency situation.

(3)   Activities approved by the City that receive a special event license, special use permit, lease, license, or other permit or permission.

(E)   Any person convicted of a violation of this Section shall be guilty of a class 3 criminal misdemeanor.  Each day of violation continued shall be a separate offense, punishable as described.

III.   Procedural History

On October 29, 2024, Plaintiff initiated this action.  (Docs. 1-2.)

On November 13, 2024, Plaintiff filed the First Amended Complaint ("FAC"). (Doc. 5.)

On March 6, 2025, the then-assigned judge issued an order granting Plaintiff's motion to proceed *in forma pauperis* and screening the FAC.  (Doc. 8.)  The court held that the FAC stated a claim sufficient to survive screening under 28 U.S.C. § 1915(e)(2) with respect to (1) Plaintiff's Fourteenth Amendment substantive due process claim, (2) Plaintiff's Fourth Amendment unlawful seizure claim, and (3) Plaintiff's vagueness claim. (*Id.*)  The Court dismissed the FAC's claims premised on (1) a public health argument alleging sleep deprivation and torture, (2) the ordinances being unnecessary and redundant,

and (3) overbreadth.  (*Id.*)

On March 25, 2025, Plaintiff moved for leave to file the SAC.  (Doc. 11.)[3]  On March 26, 2025, the then-assigned judge issued an order that, among other things, granted Plaintiff's request for leave to file the SAC.  (Doc. 13.)

On April 17, 2025, Plaintiff filed the SAC.  (Doc. 15.)

On May 6, 2025, Plaintiff filed a "Notice of Supplemental Legal Authority and Memorandum Regarding the Requirement of Intent Under the Fourteenth Amendment." (Doc. 16.)

On June 18, 2025, Plaintiff filed a "Motion for Leave to File Third Amended Complaint and Motion for Temporary Restraining Order," a "Motion for Temporary Restraining Order and Preliminary Injunction," and a "Motion for Temporary Restraining Order and Request for Expedited Consideration."  (Docs. 17-19.)

On June 22, 2025, Plaintiff filed a "Notice of Supplemental Authority in Support of Motion for Temporary Restraining Order (Chandler Ordinance)" and "Notice of Supplemental Authority (Leave to Add Chandler as Defendant)."  (Docs. 20-21.)  And on July 3, 2023, Plaintiff filed additional attachments relevant to his motions for leave to amend and for a temporary restraining order.  (Doc. 22.)

On July 11, 2025, the then-assigned judge issued an order denying Plaintiff's request for leave to file a TAC and denying both of Plaintiff's requests for a temporary restraining order.  (Doc. 23.)  The same order screened the SAC and found that "Counts One, Two, and the part of Five of the SAC that previously survived screening are substantially similar to the allegations in the FAC and therefore need not be rescreened." (*Id.* at 4.)  The order also allowed the SAC's new claims premised on the right to travel and on procedural due process to proceed.  (*Id.* at 5-7.)

On September 23, 2025, the City filed the pending motion to dismiss.  (Doc. 25.) Afterward, this action was reassigned to the undersigned (Doc. 26) and the motion to

---

[3]  Plaintiff's motion mistakenly sought leave to file a third amended complaint ("TAC").

dismiss became fully briefed (Docs. 27, 30).

On October 6, 2025, Plaintiff filed a "Notice of Supplemental Authority and Memorandum Regarding Less Restrictive Means for Addressing Encampments." (Doc. 28; Doc. 29 [errata].)

On October 27, 2025, Plaintiff filed a "Notice of Supplemental Fact." (Doc. 31.)

On October 28, 2025, Plaintiff filed the pending motion for leave to file a surreply. (Doc. 32.) That motion is now fully briefed. (Doc. 33.)

**DISCUSSION**

I. Plaintiff's Motion For Leave To File A Surreply

    A.    **The Parties' Arguments**

Plaintiff requests leave to file a surreply, arguing that the City's "[r]eply introduces new arguments and mischaracterizations not raised in its original Motion to Dismiss"— namely, (1) "[a] new and narrowed interpretation of 'seizure' under the Fourth Amendment, suggesting that only an arrest qualifies as a seizure"; (2) "[a] new claim that Plaintiff's alleged expulsion and citation did not constitute a deprivation of liberty or require due process"; (3) "[n]ew factual assertions that Plaintiff 'did not have to attend court' and 'suffered no consequences'"; (4) "[a] new justification for the ordinance based on other cities' nuisance litigation, offered for the first time in reply." (Doc. 32 at 2-3, citations omitted.)

In response, the City argues a surreply is not warranted because it "did not raise new arguments in its [r]eply." (Doc. 33 at 1.) Specifically, the City contends that its "arguments regarding lack of seizure, lack of violation of any liberty interest, and lack of allegations of any legal consequences for Plaintiff were all raised in the original Motion to Dismiss" and that its reply "simply responds to Plaintiff's arguments and the inapposite state court nuisance cases Plaintiff raised in" his Notice of Supplemental Authority. (*Id.* at 1-2.)

    B.    **Analysis**

"Surreplies are highly disfavored and permitted only in extraordinary circumstances." *Fitzhugh v. Miller*, 2020 WL 1640495, *9 (D. Ariz. 2020) (cleaned up).

"Although the Court may in its discretion allow the filing of a surreply, this discretion should be exercised in favor of allowing a surreply only where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief." *Id.* (citation omitted).  Here, the City did not raise new arguments in its reply.  Each of the arguments Plaintiff claims are "new" were either (1) raised in the City's initial motion to dismiss and/or (2) simply respond to arguments that Plaintiff made in his response brief and in his Notice of Supplemental Authority.  Accordingly, the Court will not consider the arguments raised in Plaintiff's proposed surreply (Doc. 32-1) when evaluating the City's motion to dismiss.

II.    Plaintiff's "Notices"

On May 6, 2025—after the SAC was filed but before the City moved to dismiss—Plaintiff filed a notice of supplemental legal authority "regarding the requirement of intent under the Fourteenth Amendment." (Doc. 16 at 1.)  In that notice, Plaintiff argues there is an additional reason, other than those identified in the SAC, why the Challenged Ordinances are unconstitutional—i.e., because they criminalize conduct "regardless of the intent" of the person engaged in the conduct.  (*Id.*)  Given Plaintiff's status as a *pro se* litigant, and because the City had the opportunity to respond to this argument before filing its motion to dismiss and responded to this argument in its reply without procedurally objecting to it, the Court will consider the parties' intent-related arguments when evaluating the City's motion to dismiss.

On October 6, 2025—five days after Plaintiff filed his response to the City's motion to dismiss—Plaintiff filed a notice of supplemental authority "regarding less restrictive means for addressing encampments." (Doc. 28.)  The crux of Plaintiff's argument in that notice is that the Challenged Ordinances are "unnecessary" because Arizona public nuisance law already provides an "adequate and constitutionally valid legal mechanism[]" to regulate hazardous encampments." (*Id.* at 1.)  The City did not specifically object to the filing of this notice but did argue in its reply that the authorities cited in the notice "do not support any of Plaintiffs' arguments" and "[i]f anything, these cases only further establish

that the State has a legitimate interest in maintaining cleanliness and safety in its public areas." (Doc. 30 at 10 n.5.)

The Court will not consider the arguments raised in Plaintiff's notice. First, it appears to re-raise arguments Plaintiff raised in Count Four of the FAC. (Doc. 5 ¶¶ 33-38 [asserting a claim that "the ordinance is unnecessary and redundant" because other Arizona laws, including "Arizona's public nuisance statutes," already "address the concerns related to health and sanitation"].) But that Count was dismissed in the March 6, 2025 screening order and remains subject to dismissal for the same reasons specified in that order. (Doc. 8 at 4-5.) Second, even if the Court were to construe Plaintiff's notice as an attempted extension of his response brief, Plaintiff already used the full 17 pages allowed under the Local Rules for his response brief, so consideration of his notice would allow him to circumvent that page limit.

On October 27, 2025—over two weeks after the City filed its reply in support of its motion to dismiss—Plaintiff filed a "notice of supplemental fact." (Doc. 31.) In that notice, Plaintiff "notifie[d] the Court of a recent enforcement-related encounter" he had with a City police officer in a City park. (*Id.* at 2.) The City did not respond to the notice. The Court will not consider the supplemental facts provided in Plaintiff's notice because they are not asserted in the complaint, subject to judicial notice, or incorporated by reference in the complaint. *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003).[4]

III.    The City's Motion To Dismiss

A.    **Legal Standard**

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

---

[4]    At any rate, even if the Court were to construe the notice as a request to amend the SAC, the request would be denied as futile because the additional facts provided in the notice would not alter the dismissal analysis in this order.

(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the Court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

### B. Count One

In Count One, Plaintiff alleges that the Challenged Ordinances violate his Fourteenth Amendment substantive due process rights "to autonomy in making personal life choices," to sleep, and "to determine where and how to live." (Doc. 15 ¶¶ 52-57.)

#### 1. The Parties' Arguments

The City argues that Count One "overstates the guarantees of the Fourteenth Amendment and misinterprets the ordinances." (Doc. 25 at 4.) At bottom, the City argues that "Plaintiff has failed to identify a constitutionally protected interest threatened by the [Challenged Ordinances]." (*Id.* at 7.) As for Plaintiff's alleged right to "autonomy in personal life choices," the City argues that "no case supports such a right" and that "Plaintiff cannot prevail on the basis that the Constitution guarantees a broad, generalized freedom of choice." (*Id.* at 5.) The City further argues that "[e]ven if the Court views Plaintiff's asserted right more narrowly, he is still claiming, in essence, that individuals have a constitutional right to decline traditional housing and shelter services, and thus, by way of choosing not to live elsewhere, they must have the right to live in city parks or public areas. But no case supports this position either." (*Id.*) As for Plaintiff's alleged right to sleep, the City argues that the Challenged Ordinances "do not criminalize sleeping," so "even if Plaintiff could identify a constitutional right to sleeping, the ordinances at issue do not infringe on that right." (*Id.*) Last, the City acknowledges that "courts in this circuit have recognized a Fourteenth Amendment substantive due process

claim in cases relating to city-wide policies that impact the homeless," but the City notes that, "in those cases, the plaintiffs alleged a 'state-created danger.'" (*Id.* at 5-6.)  The City argues that "Plaintiff has not, and cannot, allege state-created danger here" because "he affirmatively alleges that he voluntarily declined the alternative shelter services that the City offered." (*Id.* at 6.)

In response, Plaintiff argues that the Challenged Ordinances "criminalize harmless, life-sustaining conduct and coerce individuals into restrictive, quasi-carceral shelter programs." (Doc. 27 at 1.)  Plaintiff further argues that "the Supreme Court has long recognized that substantive due process protects personal decisions 'central to individual dignity and autonomy'" and that "[t]he right to determine 'where and how to live' and to refuse treatment is part of that autonomy." (*Id.* at 2, citations omitted.)  As for the offers of shelter, Plaintiff argues that these shelter programs "sharply restrict liberty," that the City's offers were "coercive rather than voluntary," and that the "Fourteenth Amendment includes the freedom to refuse such involuntary confinement." (*Id.*)  Last, Plaintiff argues that he "is not alleging a right to housing or placing a dwelling in the city of Mesa" and is instead "alleging a right to exist, travel and rest in public spaces while visiting." (*Id.* at 3.)

In reply, the City reiterates that "Plaintiff asserts he has been deprived of the generalized 'right to autonomy in making personal life choices'" and that "[n]o such right exists." (Doc. 30 at 2.)  The City also seeks to distinguish the cases cited by Plaintiff, arguing that those cases—which "focused on the fundamental right to marry in the context of same-sex couples," "a woman's right to terminate her pregnancy," and the "right to die"—fail to support "Plaintiff's proposal for a new constitutional right . . . 'to determine where and how to live.'" (*Id.*)

2.      Analysis

The doctrine of substantive due process is a "durable oxymoron" that "allows persons harmed by state regulation to complain that the regulation is so unreasonable a deprivation of life, liberty, or property that it is unconstitutional even if adopted and applied in conformity with the most rigorous procedural safeguards." *Ill. Psychological Ass'n v.*

*Falk*, 818 F.2d 1337, 1342 (7th Cir. 1987). It "has been criticized by a wide variety of people for a wide variety of reasons," including, "most obviously," "the pesky issue of constitutional text." *Hillcrest Prop., LLP v. Pasco Cnty.*, 915 F.3d 1292, 1304 (11th Cir. 2019) (Newsom, J., concurring). Yet even though the "theory . . . that the Fourteenth Amendment's Due Process Clause provides substantive, as well as procedural, protection . . . has long been controversial," the Supreme Court recently reaffirmed that "the Due Process Clause of the Fourteenth Amendment . . . has been held to guarantee some rights that are not mentioned in the Constitution," albeit only rights that are "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231, 237 (2022) (cleaned up). *See also Mirabella v. Bonta*, __ S. Ct. __, 2026 WL 575049, *4 (Barrett, J., concurring) ("*Dobbs* calls into question neither the doctrine of substantive due process nor the other unexpressed rights that the doctrine protects. . . . It does not follow from *Dobbs* that all our substantive due process cases conflict with [*Washington v. Glucksberg*, 521 U.S. 702 (1997)], much less that *stare decisis* would counsel overruling any that do.").

Even so, substantive due process claims "require, as a threshold matter, that plaintiffs show they were deprived of a 'constitutionally protected life, liberty or property interest.'" *Hotop v. City of San Jose*, 982 F.3d 710, 718 (9th Cir. 2020) (citation omitted). Under the Ninth Circuit's "'established method' of substantive due process analysis," the first step in the analysis is "'carefully formulating' the asserted fundamental right." *Regino v. Staley*, 133 F.4th 951, 964 (9th Cir. 2025). Courts must "reject[] broad formulations of asserted fundamental rights, in favor of being 'more precise.'" *Id.* (citation omitted). *See also Khachatryan v. Blinken*, 4 F.4th 841, 855-56 (9th Cir. 2021) ("Danuns's due process claim is based on the contention that his 'freedom to make personal choices in family life' is a constitutionally protected liberty interest and that the denial of his father's visa deprives him of that liberty so as to trigger procedural due process protections. We think that Danuns defines the asserted interest at too high a level of generality. The Supreme Court has instructed us to exercise the utmost care before breaking new ground in the area of

unenumerated fundamental rights, and the Court has insisted on a careful description of the asserted fundamental liberty interest. Thus, new fundamental rights ordinarily must be defined in a most circumscribed manner, with central reference to specific historical practices.") (cleaned up).

Next, once the asserted fundamental right has been properly articulated, "the district court must consider whether the asserted right itself, or one in which it is encompassed, is objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if it was sacrificed." *Regino*, 133 F.4th at 965 (cleaned up). "The range of liberty interests that substantive due process protects is narrow and only those aspects of liberty that we as a society traditionally have protected as fundamental are included within the substantive protection of the Due Process Clause." *Franceschi v. Yee*, 887 F.3d 927, 937 (9th Cir. 2018) (cleaned up). "In interpreting what is meant by the Fourteenth Amendment's reference to 'liberty,' we must guard against the natural human tendency to confuse what that Amendment protects with our own ardent views about the liberty that Americans should enjoy." *Dobbs*, 597 U.S. at 239. "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Nunez v. City of L.A.*, 147 F.3d 867, 871 n.4 (9th Cir. 1998) (quoting *Albright v. Oliver*, 510 U.S. 266, 272 (1994)). "These fields likely represent the outer bounds of substantive due process protection." *Id.*

Here, Count One fails because Plaintiff has not satisfied the threshold requirement of identifying the sort of liberty interest that receives substantive protection under the Fourteenth Amendment. Count One identifies three alleged liberty interests: (1) "the right to autonomy in making personal life choices"; (2) the right to sleep; and (3) the "right to determine where and how to live." Starting with the first item on this list, an initial problem is that Plaintiff defines the alleged right at an excessively high level of generality— "personal life choices" is an amorphous term that can be construed to cover practically the gamut of human existence. For this reason alone, the theory fails. *Khachatryan*, 4 F.4th

- 15 -

at 855-56.

The theory also fails during the second step of the substantive due process analysis. No Ninth Circuit or Supreme Court case recognizes a broad and expansive right to "autonomy" in making "personal life choices." In an attempt to establish the existence of such a right, Plaintiff cites *Obergefell v. Hodges*, 576 U.S. 644 (2015), *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992), and *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990). But *Casey* was recently overruled by the Supreme Court in *Dobbs* and this case is not remotely similar to *Obergefell*, which involved marriage rights, or *Cruzan*, which involved the right to refuse medical treatment.[5] Indeed, "matters relating to marriage, family, procreation, and the right to bodily integrity . . . likely represent the outer bounds of substantive due process protection." *Nunez*, 147 F.3d at 871 n.4 (citation and internal quotation marks omitted). Nor is the asserted right to autonomy in personal life choices "objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if it was sacrificed." *Regino*, 133 F.4th at 965 (cleaned up).

Second, as for the alleged right to sleep, Plaintiff once again errs by framing his claim in overly general terms. The Challenged Ordinances do not forbid the act of sleeping. A more precise articulation of Plaintiff's theory is that he claims a right to sleep wherever and whenever he pleases,[6] but the parties have not identified, and the Court has not located, a case recognizing the existence of such a sweeping right. *See, e.g.*, *Joel v. City of Orlando*, 232 F.3d 1353, 1357 (11th Cir. 2000) (rejecting homeless plaintiff's constitutional challenge to a city ordinance that prohibited camping on public property, disagreeing with the notion that "sleeping out-of-doors [is] a fundamental right," and collecting cases

---

[5] Plaintiff argues, appearing to rely on *Cruzan*, that by "effectively coerc[ing] individuals into accepting placement in shelters or programs," the City is violating the right to refuse treatment. (Doc. 27 at 3.) But the Challenged Ordinances do not require people to accept treatment—rather, as alleged in the SAC, the Challenged Ordinances allow for accepting treatment or shelter services as one of many alternatives.

[6] To the extent Plaintiff is attempting to assert a sleep deprivation claim, such a claim has already been dismissed in this case. (Doc. 8 at 4.) Nor does the SAC contain any factual allegations that would support a sleep deprivation claim.

reaching the same conclusion); *Berry v. Hennepin Cnty.*, 2022 WL 3579747, *9 (D. Minn. 2022) ("Plaintiffs cite no legal authority that recognizes a privacy right to 'safely sleep on public land when no alternative exists.' And the Court's research has not identified any. The Court grants MPRB Defendants' motion to dismiss Plaintiffs' substantive-due-process claim based on privacy interests, as alleged in Count IV of the complaint."). Nor is such a right "objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if it was sacrificed." *Regino*, 133 F.4th at 965 (cleaned up).

Finally, as for the alleged right to determine "where and how to live," Plaintiff once again seeks to define this right at an impermissibly high level of generality. *Khachatryan*, 4 F.4th at 855-56. At any rate, the Court has once again not located a case recognizing such a constitutionally protected liberty interest.[7] Nor is this alleged right "objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if it was sacrificed," *Regino*, 133 F.4th at 965 (cleaned up), or related to marriage, family, procreation, or the right to bodily integrity, *Nunez*, 147 F.3d at 871 n.4.

The analysis would be the same if Plaintiff's third theory were more specifically reframed as a right to choose homelessness. (Doc. 15 ¶ 55 ["The right to determine where and how to live, including the choice to live frugally and avoid the burdens of housing, falls within the substantive protections of the Fourteenth Amendment."].) The Supreme Court has not recognized a constitutional right to be homeless. *Cochran v. City of Wichita*, 2018 WL 4637237, *9 (D. Kan. 2018), *aff'd*, 771 F. App'x 466 (10th Cir. 2019) ("Plaintiff's complaint also contends that the camping ordinance violates his rights under the First, Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments. Plaintiff's

---

[7] In his response, Plaintiff appears to change his tune, arguing that he "is not alleging a right to housing or placing a dwelling in the city of Mesa" and is instead "alleging a right to exist, travel and rest in public spaces while visiting." (Doc. 27 at 3.) But even assuming these are constitutionally protected rights, the Challenged Ordinances do not infringe them because the Challenged Ordinances only prohibit the "establish[ment] [of] temporary or permanent living accommodations." MCC § 6-10-2 (defining "camp" or "camping"); MCC § 6-1-23 (same). *See also* Sections II.D-E, *infra*.

allegations are wholly conclusory and fail to state a claim. Plaintiff's claims are based on his alleged constitutional right to be homeless. The Supreme Cout has not held that there is a constitutional right to be homeless."). *See also Lindsey v. Normet*, 405 U.S. 56, 74 (1972) ("We do not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill. We are unable to perceive in that document any constitutional guarantee of access to dwellings of a particular quality . . . ."); *Navarro v. City of Mountain View*, 2021 WL 5205598, *6 (N.D. Cal. 2021) ("Does the right to *travel* encompass the right to *be*? It does not appear so from the caselaw. Plaintiffs do not cite binding authority for the assertion that they have a right to 'peacefully dwell[] in the place of their choosing.' As alleged, the complaint does not state a plausible claim for violations of the right to travel. Therefore, the Court dismisses these claims . . . .").

At bottom, Plaintiff has failed to identify a constitutionally protected liberty interest sufficient to support his substantive due process claim in Count One. Because this is a "threshold" requirement, *Hotop*, 982 F.3d at 718, Count One is dismissed.[8]

…

---

[8]    The City also argues that although "courts in this circuit have recognized a Fourteenth Amendment substantive due process claim in cases relating to city-wide policies that impact the homeless, . . . in those cases, the plaintiffs alleged a 'state-created danger,'" and "Plaintiff has not, and cannot, allege state-created danger here" because "he affirmatively alleges that he voluntarily declined the alternative shelter services that the City offered." (Doc. 25 at 5-6.) Plaintiff does not appear to respond to this argument, and the Court agrees that the SAC does not assert (or contain sufficient factual allegations to support) a state-created danger claim. *See, e.g.*, *Cobine v. City of Eureka*, 250 F. Supp. 3d 423, 432-33 (N.D. Cal. 2017) ("Under the danger-creation doctrine, courts consider . . . whether the danger was affirmatively created by the state action, and whether the state acted with deliberate indifference to a known or obvious danger. . . . [C]onsidering the stringent standard for finding deliberate indifference, the Court finds here that the allegations do not confirm that the state action was the impetus that put Plaintiffs in an inherently dangerous situation. . . . From the allegations in the amended complaint, it appears that the encampment residents were permitted to sleep in a City-owned parking lot or were offered temporary emergency shelter accommodations. The current circumstances are certainly not ideal, but the Court finds they do not amount to a deliberate indifference of placing Plaintiffs in an inherently more dangerous situation than they had faced previously. The general circumstances of being homeless in Humboldt County cannot be minimized. Without allegations of intentional eviction during precarious weather or other facts indicating deliberate indifference to the safety and welfare of the population, the Court must dismiss the claim.").

C.    **Count Two**

In Count Two, Plaintiff alleges that the Challenged Ordinances "coerce[] individuals" by "forcing them to choose between . . . [s]ubmitting to a restrictive shelter with curfews and controlled conditions," "[c]riminal charges and citations," and "[c]onstructive banishment" and thus "constitute[] an unlawful seizure," in violation of the Fourth Amendment, because they "significantly restrict[] Plaintiff's freedom of movement without reasonable suspicion of criminal activity." (Doc. 15 ¶¶ 58-64.)

1.    The Parties' Arguments

The City argues that "Plaintiff attempts to stretch the Fourth Amendment beyond its scope." (Doc. 25 at 7.)  Specifically, the City argues that "Plaintiff has not been seized, either in actuality or by the choices he alleges he is presented" because a seizure may only occur following "the application of force" or "a show of authority," the latter of which "requires the '*submission* to the assertion of authority.'" (*Id.*, citations omitted.)  The City argues that "Plaintiff does not allege that he was physically restrained" and "instead alleges, at most, that [the Challenged Ordinances] and their enforcement operate as a show of authority that restrains his liberty." (*Id.* at 8.)  The City further argues that for there to be a seizure, a "reasonable person" must "have believed that he was not free to leave," whereas here, "Plaintiff alleges the exact opposite—he was asked *to go*, and he did." (*Id.*, citations omitted.)  Moreover, the City argues that "[i]t is also well established that the mere issuance of a citation is not a seizure." (*Id.* at 8 n.5.)  Ultimately, the City argues that "[b]ecause the rangers did not attempt to physically restrain Plaintiff, nor did they exhibit a 'show of authority' with which Plaintiff complied, Plaintiff was not 'seized.'" (*Id.* at 8.)  And the City argues that "even if [Plaintiff's] allegations do rise to the level of a seizure, Plaintiff still fails to establish that being offered shelter services or being asked to leave the park is 'unreasonable.'" (*Id.*)

In response, Plaintiff argues that the City's contention that he "was not 'seized' because he was 'free to leave' . . . misunderstands the scope of the Fourth Amendment." (Doc. 27 at 14.)  Plaintiff argues that the City's "argument rests on an overly narrow

conception of seizure—one limited to arrests or physical detentions," "[b]ut the Fourth Amendment protects not only against confinement but against any governmental restraint on personal liberty or freedom of movement, whether that restraint confines a person within a space or excludes them from one." (*Id.*) Plaintiff argues that when he "was ordered by armed rangers to vacate a public park under threat of criminal penalty and told he was 'expulsed until his court date,'" this was "a classic restraint on liberty" because "he was not free to remain where he lawfully was." (*Id.*) Moreover, Plaintiff argues that "courts have recognized that exclusionary orders from public places implicate constitutional liberty." (*Id.* at 15.) Plaintiff also argues the City's "enforcement regime coerces unhoused persons to accept placement in programs or shelters under threat of citation or expulsion from public space," and "[c]oerced compliance under threat of punishment constitutes a constructive seizure." (*Id.* at 16.) Plaintiff then proceeds to compare the shelter programs offered by the City to "incarceration under a work-furlough scheme." (*Id.*) Last, Plaintiff argues that the restraint on his liberty is unreasonable because "forcing individuals into quasi-custodial programs under threat of prosecution serves no legitimate public safety interest proportionate to the intrusion on personal liberty." (*Id.* at 17.) "The Constitution," Plaintiff argues, "does not permit government to convert assistance into compulsion or to equate poverty with forfeiture of liberty." (*Id.*)[9]

In reply, the City reiterates that "Count [Two] fails because [Plaintiff] was never seized." (Doc. 30 at 3.) The City argues that "Plaintiff makes the extraordinary argument that a seizure 'encompasses *any* governmental action that restrains personal liberty,'" and it argues that such an interpretation is "untenable" because it would result in "simply enacting an ordinance" constituting a seizure. (*Id.*) The City argues that the "Supreme Court has made clear that it is undesirable 'to stretch the Fourth Amendment beyond its

---

[9] Plaintiff encloses, as an attachment to his response brief, a news article purportedly showing that the City's park rangers "form[ed] a 'Goon Squad' that targeted and assaulted unhoused individuals." (Doc. 27 at 12-13; Doc. 27-1 [news article].) The Court is unable to consider the substance of this article because it was not attached to the SAC, was not incorporated by reference into the SAC, and is not subject to judicial notice. *Ritchie*, 342 F.3d at 907-08. In any event, this article does not advance Plaintiff's Fourth Amendment seizure claim.

words and beyond the meaning of arrest,'" yet "[t]hat is precisely what Plaintiff urges here." (*Id.*, citation omitted.)  Next, the City reiterates that a seizure requires a person to be detained or to believe he is not free to leave, whereas here, Plaintiff "affirmatively alleges that he *did leave*." (*Id.* at 3-4.)  Last, the City rejects Plaintiff's comparison of shelters to "work-release, parole, or probation" because "those comparisons are obviously distinguishable as occurring after a conviction, and perhaps more importantly, Plaintiff was not subjected to those conditions, as he consistently rejected shelter services." (*Id.*at 4 n.1.)

### 2. Analysis

Count Two fails to state a claim because there is no plausible allegation that the Challenged Ordinances result in the sort of "seizure" contemplated by the Fourth Amendment.  "The 'seizure' of a 'person' can take the form of physical force or a show of authority that in some way restrains the liberty of the person." *Puente v. City of Phoenix*, 123 F.4th 1035, 1051 (9th Cir. 2024) (quoting *Torres v. Madrid*, 592 U.S. 306, 311 (2021)).

As an initial matter, the SAC does not allege that Plaintiff was ever subjected to physical force. *Cf. California v. Hodari D.*, 499 U.S. 621, 625 (1991) ("The present case . . . does not involve the application of any physical force; Hodari was untouched by Officer Pertoso at the time he discarded the cocaine.").

Nor do the allegations in the SAC support a Fourth Amendment seizure claim under a show-of-authority theory.  In *Puente*, the Ninth Circuit affirmed the district court's determination "that the PPD's dispersal of class members by the *airborne* transmission of chemical irritants (such as tear gas and pepper spray) and auditory or visual irritants (such as the sound and flash produced by flash-bang grenades) does not constitute a seizure within the meaning of the Fourth Amendment." 123 F.4th at 1050-51.  The Ninth Circuit held that "an application of force with an objective intent merely to *disperse* or *exclude* persons from an area—and *without* any measures objectively aimed at detaining or confining them in the process—does not involve the necessary 'intent to *restrain*' that might give rise to a 'seizure.'" *Id.* at 1052.  Although the plaintiffs in *Puente* did "not contend that they were seized by a 'show of authority' to which they submitted, but only

that they were seized by an application of physical force with an objective intent to restrain," the Ninth Circuit explained that its conclusion under a physical-force theory was "confirmed by considering what a contrary conclusion would mean" under a show-of-authority theory.  *Id.* at 1051-52.  Relying on the Supreme Court's opinion in *Torres*, the Ninth Circuit stated:

> As noted earlier, the Court in *Torres* confirmed that a "'seizure' of a 'person' can take the form of physical force *or a show of authority that in some way restrains* the liberty of the person."  However, a "show of authority that in some way restrains" a person does not become a seizure "unless and until the [person] *complies* with the demand."  If a mere objective intent to disperse suffices to constitute an intent to "restrain," that would mean that a simple instruction to leave an area or certain premises would constitute a "seizure" if it is obeyed.  And that would mean, for example, that a public librarian who merely instructs all the patrons to leave at closing time has "seized" all of those who comply.  We are aware of no support for such an extravagant proposition.

*Id.* at 1052 (cleaned up).  *Puente*'s holding on this point is consistent with decisions from many courts outside the Ninth Circuit confirming that a directive from an officer to leave a location does not constitute a seizure.  *See, e.g.*, *Peery v. City of Miami*, 977 F.3d 1061,1071 (11th Cir. 2020) ("[P]olice move-on orders do not raise a constitutional issue.  The homeless assert the orders violate their Fourth, Fifth, and Fourteenth Amendment rights.  They are incorrect."); *Johnson v. City of Ferguson, Mo.*, 926 F.3d 504, 506 (8th Cir. 2019) (finding no seizure where the complaint conceded that the plaintiff was not "ordered to stop and to remain in place" and explaining that "[b]ecause there was no verbal or physical impediment to [the plaintiff's] freedom of movement, there was no submission to authority on his part even in a metaphysical sense of the meaning of that word"); *Salmon v. Blesser*, 802 F.3d 249, 253 (2d Cir. 2015) ("Police officers frequently order persons to leave public areas: crime scenes, accident sites, dangerous construction venues, anticipated flood or fire paths, parade routes, areas of public disorder, etc.  A person may feel obliged to obey such an order.  Indeed, police may take a person by the elbow or employ comparable guiding force short of actual restraint to ensure obedience with a departure

order.  Our precedent does not view such police conduct, without more, as a seizure under the Fourth Amendment as long as the person is otherwise free to go where he wishes."); *Bach v. Milwaukee Cnty. Cir. Ct.*, 565 F. App'x 531, 534 (7th Cir. 2014) ("[Plaintiff] maintains that she was seized in a public park because she believed that [the officer] would have used force to arrest her if she failed to leave.  But, as the magistrate judge concluded, [the plaintiff's] own allegations show that [the officer] required her only to leave the park; he did not try to take her into custody, handcuff her, or apply physical force.  A reasonable person therefore would have felt free to leave, as [the plaintiff] herself did.").

The Sixth Circuit's decision in *Youkhanna v. City of Sterling Heights*, 934 F.3d 508 (6th Cir. 2019), is also instructive.  There, the plaintiff was removed from a council meeting by police but was "not otherwise detained."  *Id.* at 522-23.  The plaintiff argued that "she was seized the moment that Mayor Taylor ordered her out of the Council chambers," but the Sixth Circuit disagreed.  *Id.* at 523.  Relying on the Second Circuit's decision in *Salmon*, the Sixth Circuit noted that "the Supreme Court has recognized [that] the 'free to leave' test may not be the best measure of a seizure where a person has no desire to leave the location of a challenged police encounter.'"  *Id.* (quoting *Salmon*, 802 F.3d at 253).  The Sixth Circuit acknowledged that the Supreme Court in *Florida v. Bostick*, 501 U.S. 429 (1991), held that "'whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter' was an appropriate test to determine whether a seizure occurred when someone was asked for consent to search his bag while on a bus that he did not want to exit."  *Id.* (quoting *Bostick*, 501 U.S. at 436).  But the Sixth Circuit found *Bostick* inapplicable because the officers in *Youkhanna* "were not asking [the plaintiff] for consent or engaging in a voluntary interaction with her; rather, they were ordering her to leave a place she wanted to be."  *Id.*  The Sixth Circuit noted that the "Second Circuit addressed a similar situation in *Salmon*" and held that when officers "order persons to leave public areas . . . such police conduct, without more, [is not] a seizure under the Fourth Amendment as long as the person is otherwise free to go where he wishes."  *Id.* (quoting *Salmon*, 802 F.3d at 253).  The Sixth Circuit ultimately held as follows:

> We are inclined to agree with the Second Circuit, at least in circumstances where the person being asked to leave is not privileged to remain in the space—either because the space is no longer open to the public (for example, a building is closing or the space must be cleared of all people for safety reasons) or because the person's behavior violated a rule, ordinance, or law (for example, by causing a disturbance). Here, [the plaintiff] lost her privilege to remain in the otherwise-public meeting.
>
> . . .
>
> [The plaintiff] lost her privilege to remain in the public meeting because of her behavior. Her description of the force used by officers to escort her out—holding her hand or arm, tapping her—does not exceed guiding force, especially in light of her mid-exit refusal to leave the Council chambers. There was certainly no painful force, and [the plaintiff's] freedom was unrestricted once she exited the building. Because there was no seizure, [the plaintiff's] Fourth Amendment rights were not violated, and summary judgment in favor of defendants was appropriate.

*Id.* at 523-24 (citation omitted). Here, the SAC alleges that during each encounter with park rangers, Plaintiff was given three options: (1) accept shelter, mental health, and/or rehabilitation services; (2) receive a citation for violating the Challenged Ordinances; or (3) face arrest or expulsion/banishment from the public space. (Doc. 15 ¶ 27.) As the above-cited authorities make clear, the presentation of such options by a law enforcement officer does not amount to a seizure.

The three encounters with park rangers identified in the SAC also fail to allege a seizure under a show-of-authority theory for other reasons. As for the first encounter, the SAC alleges that "Plaintiff was approached by two armed rangers while sleeping in a park," who told him he had to remain upright in the park. (Doc. 15 ¶ 34.) The rangers offered Plaintiff services, which he declined. (*Id.*) The rangers then warned Plaintiff that if they saw him lying down again, he would get a ticket. (*Id.*) "After the rangers left, Plaintiff left the park . . . ." (*Id.*) As an initial matter, these allegations leave open the question whether Plaintiff disobeyed the rangers' commands. *Hodari*, 499 U.S. at 629 (no seizure under show-of-authority theory if the person does not comply). Regardless, nothing about this encounter suggests there was any "restraint" placed on Plaintiff. Plaintiff alleges he left the park *after* the rangers left. True, Plaintiff alleges that the alternative to compliance with

the rangers' commands was a ticket, but "[n]umerous courts have held that the mere issuance of a citation does not even constitute a seizure, let alone a formal arrest." *White v. City of Laguna Beach*, 679 F. Supp. 2d 1143, 1155 (C.D. Cal. 2010) (collecting cases). *Cf. Gutenkauf v. City of Tempe*, 2011 WL 1672065, *2 (D. Ariz. 2011) ("A traffic citation is not a seizure under the Fourth Amendment.").

As for the second encounter, the SAC alleges that "Plaintiff was approached by two armed park rangers who accused him of violating [MCC] § 6-10-4(V) by allegedly 'storing personal belongings' in the park due to the presence of his backpacks." (Doc. 15 ¶ 36.) "During this interaction, the park rangers explicitly threatened to issue a citation if Plaintiff did not comply with their directive to reduce the number of bags he was carrying." (*Id.* ¶ 37.) In response to one ranger's "warn[ing] that if Plaintiff did not comply, he would be banished from the park and/or cited under MCC 6-10-4(V) for the number of bags he had," "Plaintiff had no real choice but to comply." (*Id.* ¶ 42.) As with the previous encounter, there was no "restraint" placed on Plaintiff. In essence, Plaintiff was told to consolidate his belongings, otherwise he would receive a citation (which does not constitute a seizure under *White*) or be ordered to leave the park (which does not constitute a seizure under *Puente*, *Youkhanna*, and *Salmon*). This encounter, too, does not constitute a seizure.

As for the third encounter, the SAC alleges that Plaintiff was again approached by park rangers and "instructed . . . to consolidate his bags." (Doc. 15 ¶ 44-45.) After Plaintiff "stood firm in asserting his right to retain his belongings as he saw fit, . . . the ranger issued Plaintiff a criminal citation for alleged 'urban camping' under MCC § 6-10-4(V)." (*Id.* ¶ 48.) But as noted, a citation is not a seizure for Fourth Amendment purposes. The SAC then alleges that, after Plaintiff received the citation, "he was . . . expulsed from the park and could not return until after his scheduled court date." (*Id.* ¶ 49.) But per *Puente*, *Youkhanna*, and *Salmon*, a person who is ordered to leave a public space after violating the law is not "seized" under the Fourth Amendment (at least absent evidence of any physical force used to restrain the person).

Plaintiff's counterarguments are unavailing. Plaintiff disputes the City's reliance

on *Doscher v. City of Tumwater*, 2022 WL 3867365 (W.D. Wash. 2022), *aff'd sub. nom.*, *Doscher v. Timberland Reg'l Libr.*, 2024 WL 3508048 (9th Cir. 2024).  There, the court held that "Doscher was not seized by being pressured to leave the Library" because "[h]e not only was free to leave; he was encouraged to leave."  *Id.* at *5.  The court explained that Doscher's "freedom of movement was limited in the sense that he felt he could not stay at the Library, but he was never detained.  Ultimately, he used his freedom of movement to leave without incident."  *Id.*  Plaintiff argues *Doscher* is distinguishable because there, unlike here, "the plaintiff had no continuing prohibition against reentry and no threat of sanction."  (Doc. 27 at 15.)  But Plaintiff ignores that the plaintiff in *Doscher* was "banned from the Library for the rest of the day."  2022 WL 3867365 at *4.  Additionally, the plaintiff in *Doscher* was threatened with a "trespass warning notice."  *Id.*  The Court is also unpersuaded by Plaintiff's reliance on *Catron v. City of St. Petersburg*, 658 F.3d 1260 (11th Cir. 2011), as *Catron* does not address seizures under the Fourth Amendment.  Finally, there is no merit to Plaintiff's argument that "coercion into shelters and programs constitutes a seizure."  (*Id.* at 15-16, cleaned up.)  As the City notes in its reply (Doc. 30 at 4 n.1), Plaintiff never accepted the shelter services offered to him.  Moreover, Plaintiff acknowledges that shelter was simply one of multiple options provided to him.

For these reasons, Count Two is dismissed.

### D.      **Count Three**

In Count Three, Plaintiff alleges that the Challenged Ordinances violate his Fourteenth Amendment substantive due process right to intrastate travel, under a theory of "constructive banishment."  (Doc. 15 ¶¶ 65-72.)

#### 1.      The Parties' Arguments

The City argues that the right to intrastate travel "is not recognized in this Circuit, and no court has recognized Plaintiff's novel theory of 'constructive banishment.'"  (Doc. 25 at 9.)  The City acknowledges that "[s]ome circuits, such as the Sixth Circuit, indeed recognize" a right to intrastate travel but contends that "the Ninth Circuit does not, and

district courts within the Ninth Circuit have declined to expand the reaches of substantive due process protections on their own." (*Id.*) Alternatively, the City argues that the Challenged Ordinances "do not prohibit travelling" and instead "prohibit camping—the establishment of living accommodations." (*Id.*) Thus, the City argues that "even if this Circuit recognized a right to intrastate travel, that right is not disturbed by" the Challenged Ordinances. (*Id.* at 10.) As for Plaintiff's "constructive banishment" theory, the City argues that "no court anywhere has recognized a claim for constructive banishment. And regardless, the ordinances at issue do not 'banish' or 'cast out' the homeless population, particularly because the City invites the homeless to accept shelter services, mental health treatment, and rehabilitation programs." (*Id.*)

In response, Plaintiff argues that the "Ninth Circuit has not foreclosed" the right to intrastate travel and relies on *Nunez by Nunez v. City of San Diego*, 114 F.3d 935 (9th Cir. 1997), to argue that the Ninth Circuit "recogniz[es] intrastate travel as a liberty interest." (Doc. 27 at 6.) Plaintiff contends that "[b]y threatening citations against individuals resting or possessing belongings in public parks, [the City's] enforcement unreasonably restricts that liberty." (*Id.*) Next, relying on *Catron*, Plaintiff argues that "[c]ourts have also held that the right to exist in public spaces is a liberty interest" and that people "have a constitutionally protected liberty interest to be in parks or on other city lands of their choosing that are open to the public generally." (*Id.*) In support of his "constructive banishment" theory, Plaintiff argues that "[w]hile few courts have addressed the term directly, its principle aligns with *Aitken v. City of Aberdeen*, 393 F. Supp. 3d 1075, 1084 (W.D. Wash. 2019), which held that expelling unhoused residents from all public property raises serious constitutionality concerns." (*Id.* at 7.) Plaintiff encourages the Court to "create precedent" adopting this constructive banishment theory. (*Id.*) Next, Plaintiff disputes that the Challenged Ordinances only regulate "camping," arguing that he "has never camped, lived, or established any form of dwelling within the City of Mesa." (*Id.*) Plaintiff also argues that the City's "reliance on its offer of 'shelter services' cannot cure the constitutional violation" and that "[f]orcing travelers or unhoused persons into shelters

- 27 -

with curfews, restricted liberty, and mandatory programming is not a constitutionally permissible substitute for freedom of movement." (*Id.* at 9.) Last, Plaintiff argues that he is not seeking a "right to living accommodations" and instead is asserting a "right to exist, rest, and move through public spaces without being criminalized for appearing poor or carrying belongings." (*Id.*)

In reply, the City reiterates that "the Ninth Circuit does not recognize a fundamental right to intrastate travel." (Doc. 30 at 4.) The City also reiterates that "even if Plaintiff is correct that the Ninth Circuit has not foreclosed the possibility that the Constitution guarantees the right to intrastate travel, Plaintiff has not been deprived of the ability to travel, nor do the [Challenged] [O]rdinances deny anyone that ability." (*Id.*) The City next argues that *Aitken* is distinguishable because it "simply granted a temporary restraining order" and because the decision rested, at least in part, on the fact that city-defendant admitted it lacked sufficient shelter space—whereas here, "Plaintiff makes no similar allegation." (*Id.* at 5.)

> 2. <u>Analysis</u>

As noted, substantive due process claims "require, as a threshold matter, that plaintiffs show they were deprived of a 'constitutionally protected life, liberty or property interest.'" *Hotop*, 982 F.3d at 718 (citation omitted). Furthermore, "matters relating to marriage, family, procreation, and the right to bodily integrity . . . likely represent the outer bounds of substantive due process protection." *Nunez*, 147 F.3d at 871 n.4 (internal quotation and citation omitted). The alleged rights underlying Count Three—the right to intrastate travel and the right to be free from "constructive banishment" (Doc. 15 ¶¶ 67, 70)—have nothing to do with marriage, family, procreation, or bodily integrity.[10]

Nor are these alleged rights "objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice

---

[10]    Count Three also alleges that "the threat of criminal citation or forced removal for merely sleeping or resting in public constitutes an unconstitutional constructive seizure, coercing individuals into either relocating, complying with unwanted programs, or facing punishment." (Doc. 15 ¶ 71.) This argument, premised on sleep, is without merit for the reasons discussed in relation to Count One.

would exist if [they were] sacrificed." *Regino*, 133 F.4th at 965 (cleaned up).  Neither the Supreme Court nor the Ninth Circuit has recognized a Fourteenth Amendment right to intrastate travel.  *Nunez*, 114 F.3d at 944 n.7 ("Other circuit courts are split as to whether the Constitution guarantees the fundamental right of intrastate travel.  The Supreme Court has declined to decide the issue.  We need not decide the issue in order to resolve this appeal, so we express no opinion on it.") (citations omitted).  Several district courts within the Ninth Circuit have declined to recognize such a right.  *See, e.g.*, *Matsumoto v. Labrador*, 701 F. Supp. 3d 1069, 1079 (D. Idaho 2023) ("Plaintiffs ask this Court to recognize the right to intrastate travel or freedom of movement as a fundamental right, and to find that Idaho Code Section 18-623 unconstitutionally infringes upon that right.  The Court respectfully declines Plaintiffs' invitation."); *Navarro*, 2021 WL 5205598 at *6 n.2 ("The Court's research presented substantial support for interstate travel as a fundamental right, but nothing for intrastate travel."); *Abshire v. Newsom*, 2021 WL 3418678, *5 (E.D. Cal. 2021), *aff'd*, 2023 WL 3243999 (9th Cir. 2023) ("[N]either the Supreme Court nor the Ninth Circuit has recognized a constitutional right to intrastate travel."); *Disbar Corp. v. Newsom*, 508 F. Supp. 3d 747, 753 (E.D. Cal. 2020) ("Plaintiffs fail to persuade the Court that a due process liberty interest is at stake.  Plaintiffs argue they have a fundamental right 'to be out and about in public.'  However, Defendants correctly point out that the Ninth Circuit has declined to rule on whether the Constitution guarantees the right of intrastate travel.") (cleaned up); *Raiser v. City of Murrieta*, 2020 WL 4758563, *6 (C.D. Cal. 2020), *report and recommendation adopted*, 2020 WL 3971370 (C.D. Cal. 2020) ("Raiser alleges a violation of his right to intrastate travel.  However, there is no recognized fundamental right to intrastate travel.").  The Court agrees with these authorities and respectfully declines to follow the out-of-circuit authorities cited by Plaintiff.  *Matsumoto*, 701 F. Supp. 3d at 1079 ("Courts are cautioned to 'exercise the utmost care' when asked to expand the substantive due process liberty protections. . . .  While the Court does not find Plaintiffs' intrastate travel claim is brought in bad faith or frivolous given the caselaw from other Circuits, there is simply no authority in this Circuit at this time upon which to recognize a

liberty interest in the right to intrastate travel, let alone a fundamental right.") (citation omitted); *Hammel v. Tri-Cnty. Metro. Transp. Dist. of Oregon*, 955 F. Supp. 2d 1205, 1210 (D. Or. 2013) (acknowledging a split on the issue but finding "it highly improbable that the Ninth Circuit would recognize a fundamental right to intrastate travel absent some form of absolute or intentional interference").

Moreover, the SAC does not plausibly allege that the Challenged Ordinances violate any hypothetical right to intrastate travel. In reality, Plaintiff is attempting to assert a right to be and remain in City parks and on City property on his own terms. *Cf. Navarro*, 2021 WL 5205598 at *6 ("Plaintiffs argue that the Ordinances deter their travel by 'making it difficult if not impossible for them to be anywhere in the City.' It is unclear how 'travel' is implicated when Plaintiffs frame the allegation using a different verb: 'be.' Does the right to *travel* encompass the right to *be*? It does not appear so from the caselaw. . . . As alleged, the complaint does not state a plausible claim for violations of the right to travel."); *Davison v. City of Tucson*, 924 F. Supp. 989, 993 (D. Ariz. 1996) (concluding that "the fundamental right to interstate travel [was] not implicated" in a case challenging the constitutionality of a resolution forcing out those in a homeless encampment, because the plaintiffs "do not seek to *travel* anywhere; they seek only to remain").

Plaintiff's novel "constructive banishment" theory fares no better. In support of this theory, Plaintiff cites *Aitken*, which partially granted temporary injunctive relief in relation to a municipal anti-camping ordinance, observed that "there is some inherent force to the argument that a City cannot effectively cast out its homeless population," and held that "because the City's ordinances do encompass all public property and it remains unclear where River Camp's evictees will relocate, the Court is presently unwilling to hold that Plaintiffs' right to travel claim is destined to fail." *Aitken*, 393 F. Supp. 3d at 1084-85. *Aitken* is distinguishable here for several reasons. First, *Aitken* addressed a motion for a temporary restraining order, where the standard is merely whether a plaintiff is likely to succeed on the merits. Second, as the City notes (Doc. 30 at 5), the court granted the *Aitken* plaintiffs' request for temporary relief at least in part because it remained unclear where

the homeless encampment's evictees would relocate. Indeed, in *Aitken*, the defendant-city "acknowledge[d] that there is currently insufficient shelter for Aberdeen's homeless at all times." 393 F. Supp. 3d at 1080. In contrast, there are no allegations in the SAC that the City lacks sufficient shelter space. To the contrary, the SAC affirmatively alleges that, on several occasions, available shelter services were offered to Plaintiff (Doc. 15 ¶¶ 34, 35, 46) but Plaintiff refused them. Third, although the court in *Aitken* presupposed for purposes of its TRO analysis as of 2019 that there may be a substantive due process right to intrastate travel, *Aitken*, 393 F. Supp. 3d at 1085 ("[T]he Court is presently unwilling to hold that Plaintiffs' right to travel claim is destined to fail."), the issue is more squarely presented here and, as discussed above, the Court cannot see how the existence of such a right can be squared with intervening Ninth Circuit and Supreme Court precedent on the issue of substantive due process.[11]

Finally, the Court rejects Plaintiff's invitation to break new ground and recognize new substantive due process rights. (Doc. 27 at 7 ["[A] court's function is not only to follow precedent, but to create precedent."].) As the Supreme Court recently emphasized, "[i]n interpreting what is meant by the Fourteenth Amendment's reference to 'liberty,' we must guard against the natural human tendency to confuse what that Amendment protects with our own ardent views about the liberty that Americans should enjoy. . . . Substantive due process has at times been a treacherous field . . . and it has sometimes led [courts] to usurp authority that the Constitution entrusts to the people's elected representatives. . . . [W]e must . . . exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the [judiciary]." *Dobbs*, 597 U.S. at 239-40 (cleaned up).

For these reasons, Count Three is dismissed.

…

---

[11]    For similar reasons, Plaintiff's reliance on *Pottinger v. City of Miami*, 810 F. Supp. 1551 (S.D. Fla. 1992), is misplaced. There, the court stated that "[g]iven the vast number of homeless individuals and the disproportionate lack of shelter space, the plaintiffs truly have no place to go." *Id.* at 1580. In contrast, the SAC affirmatively alleges that shelter services were both available and offered to Plaintiff and that he simply refused those offers.

E.      **Count Four**

In Count Four, Plaintiff alleges that the Challenged Ordinances violate his right to procedural due process under the Fourteenth Amendment.  (Doc. 15 ¶¶ 73-80.)

1.      The Parties' Arguments

The City argues that "[j]ust as in a substantive due process claim, a procedural due process claim cannot survive without a showing that the plaintiff was deprived of a constitutionally protected right" and "Plaintiff has failed to identify such an interest here." (Doc. 25 at 11.)  The City argues that *Johnson v. City of Cincinnati*, 310 F.3d 484 (6th Cir. 2002), cited by Plaintiff, "remains inapplicable here" because it relies on the right to intrastate travel.  (Doc. 25 at 11.)  The City further argues that "Plaintiff's allegations demonstrate that the City affords due process to those who violate the ordinances" and that the citation with a hearing date issued to Plaintiff "provides notice of an opportunity to be heard; that *is* due process."  (*Id.*)

In response, Plaintiff clarifies that his procedural due process claim is premised on his "allegations that he was expelled from parks immediately—without notice or hearing—for approximately a month before his scheduled court date."  (Doc. 27 at 13.)  Plaintiff argues that "[t]emporary expulsions from public spaces without any notice or hearing are constitutionally insufficient."  (*Id.*)

In reply, the City reiterates that "Plaintiff has failed to identify a protected interest of which he was deprived without due process."  (Doc. 30 at 6.)  First, the City argues that the Challenged Ordinances "do not prohibit anyone from simply being in a park."  (*Id.*)  Second, the City argues that, under *Catron*, "a person may forfeit" any "protected liberty interest to be in a public park" by "violation of law."  (*Id.*)  Third, the City argues that although Plaintiff was "informed . . . that he was being expulsed from the park," "he does not allege that he was actually forced to leave, that he left, or that such an expulsion was enforced in any way."  (*Id.*)  Last, the City reiterates that the citation plaintiff received, "which set a court date," "was the notice and opportunity to be heard that is required by the Constitution."  (*Id.* at 7.)

2.    Analysis

In his response brief, Plaintiff clarifies that his procedural due process claim in Count Four is premised on his alleged temporary expulsion from the park after he received a citation for violating the Challenged Ordinances. (Doc. 27 at 13. *See also* Doc. 15 ¶ 49.) Accordingly, the narrow question presented here is whether that alleged expulsion pending Plaintiff's court date constitutes a procedural due process violation.

"A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927, 931 (9th Cir. 2017) (citation omitted). "To state a prima facie . . . procedural due process claim, one must, as a threshold matter, identify a liberty or property interest protected by the Constitution." *United States v. Guillen-Cervantes*, 748 F.3d 870, 872 (9th Cir. 2014).

Plaintiff fails to meet that threshold requirement because he has not alleged a constitutionally protected liberty interest of which he was deprived. In his response brief, Plaintiff identifies his "liberty to access public spaces" as the interest of which he was deprived. (Doc. 27 at 13.) True, at least one court has recognized that "[p]laintiffs have a constitutionally protected liberty interest to be in parks or on other city lands of their choosing that are open to the public generally." *Catron*, 658 F.3d at 1266. But that right, "of course, is not absolute." *Id.* at 1267 n.5. There is no "constitutional right to use public parks under all conditions and at all times." *Id.* "[A] person may forfeit this liberty right by trespass or other violation of law." *Id.* at 1266. *See also Sheets v. City of Punta Gorda, Fla.*, 415 F. Supp. 3d 1115, 1127-28 (M.D. Fla. 2019) ("[I]f a person forfeits the liberty interest, then there has been no deprivation."). The SAC alleges that Plaintiff was *first* "issued . . . a criminal citation for alleged 'urban camping' under MCC § 6-10-4(V)" and "was *then* informed by the ranger that he was being expulsed from the park and could not return until after his scheduled court date." (Doc. 15 ¶¶ 48-49, emphasis added.) By violating the Challenged Ordinances, Plaintiff forfeited any constitutionally protected liberty interest he may have had to be in the park and thus fails to allege a deprivation

premised on his subsequent, temporary expulsion from the park.  *Cf. Sheets*, 415 F. Supp. 3d at 1127-28.

Accordingly, Count Four is dismissed.[12]

F.    **Count Five**

In Count Five, Plaintiff alleges that the Challenged Ordinances are unconstitutionally vague.  (Doc. 15 ¶¶ 81-96.)

1.    The Parties' Arguments

The City argues that the Challenged Ordinances are not unconstitutionally vague. (Doc. 25 at 12-15.)  First, the City argues that the fact that "certain phrases in isolation . . . are undefined by the Code . . . alone is insufficient to invalidate a law." (*Id.* at 13.)  The City argues that the Challenged Ordinances "*do* provide statutory definitions and narrowing context," including "by specifically listing many 'indications of camping.'" (*Id.*)  Thus, the City argues that "the ordinances are not vague, even if it may be difficult to determine whether marginal offenses fall within their scope." (*Id.*)  Second, the City argues that Plaintiff's reliance on an "arbitrary enforcement theory" fails. (*Id.* at 14.)  The City again emphasizes the presence of the "indications of camping" in the Challenged Ordinances' "camping" definitions, as well as the presence of "a clause demanding consideration of 'all the circumstances,'" which the City argues "establish minimal guidelines to govern law enforcement." (*Id.*, citation omitted.)  Moreover, the City argues that "even if it is conceivable that the homeless will be disproportionately cited under [the Challenged Ordinances] (though Plaintiff does not specifically allege that), it remains 'entirely reasonable to conclude that homeless persons would be more likely to engage in the type of conduct prohibited by the [Challenged Ordinances] and would therefore constitute the majority of people [cited] for violating its provisions.'" (*Id.* at 14, quoting *Joel*, 232 F.3d at 1360 n.5).  Last, citing several cases from other jurisdictions, the City

---

[12]    This conclusion makes it unnecessary to address the three-part balancing test in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which is only used to determine what process is due once a plaintiff has made a threshold showing of a deprivation of a constitutional interest.

- 34 -

argues that "[a]cross the nation, plaintiffs have brought challenges to similar laws under both vagueness theories, and courts have consistently rejected those arguments and upheld the ordinances." (*Id.* at 14-15.)

In response, Plaintiff first argues that several of the cases cited by the City are distinguishable because they "examined whether citing or arresting an unhoused person for sleeping outdoors constituted cruel and unusual punishment when no shelter was available." (Doc. 27 at 3-4.)  Plaintiff also argues that the City's reliance on *United States v. Thomas*, 864 F.2d 188 (D.C. Cir. 1988), is misplaced because *Thomas* "did not address the *mens rea* issue or consider whether the ordinance violated liberty or equal protection." (*Id.* at 5.)  Plaintiff also seeks to distinguish *Thomas* on the ground that the City's "rangers and police routinely enforce the [Challenged Ordinances] based on a single indicator—like resting, having bedding, or holding personal property—and have done so exclusively against individuals perceived as unhoused." (*Id.* at 10.)  Plaintiff further seeks to distinguish *Thomas* on the ground that "*Thomas* involved limited parkland regulations under federal jurisdiction," whereas the Challenged Ordinances "cover all parks, sidewalks, and public spaces citywide." (*Id.*)  Plaintiff next responds to the City's argument that the "indicating of camping" provide guidance to law enforcement, arguing that "[i]n practice, the opposite is true" because "Plaintiff was cited and threatened solely for possessing backpacks while resting in a public park." (*Id.* at 9.)  Plaintiff also argues that "the [C]hallenged [O]rdinances expressly criminalize conduct 'regardless of intent'" and that the City "has not addressed or refuted that argument." (*Id.* at 11-12.)  Plaintiff argues that "the absence of a *mens rea* requirement" in the Challenged Ordinances "compounds vagueness and invites arbitrary enforcement." (*Id.* at 12.)

In reply, the City reiterates that the Challenged Ordinances are not unconstitutionally vague under any of the theories presented by Plaintiff. (Doc. 30 at 7-9.)  First, the City argues that even if "certain words in the ordinances are undefined," "mathematical precision is not required" and "the ordinances give definitions and narrowing context." (*Id.* at 7.)  Second, the City argues that the Challenged Ordinances do

not encourage arbitrary and discriminatory enforcement because they instruct law enforcement "which factors to consider in evaluating the totality of the circumstances." (*Id.* at 8.) Third, as for the lack of a *mens rea* requirement, the City argues that "the Constitution does not require a knowingly criminal mind in order that an act be punished as criminal." (*Id.*, cleaned up.) Last, responding to Plaintiff's attempts to distinguish *Thomas*, the City argues that "*Thomas* . . . remains a good example of why the Court should reject Plaintiff's vagueness challenge" because "[t]he ordinance at issue in *Thomas* was similar to the ones at play here" and because "*Thomas* is just one of many cases upholding anti-camping laws against vagueness challenges." (*Id.* at 9.)

2.    <u>Analysis</u>

"Vagueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1155 (9th Cir. 2014) (citation omitted). The Challenged Ordinances are not unconstitutionally vague for either of those reasons.

In *Thomas*, the plaintiffs challenged a regulation that prohibited camping in areas such as Lafayette Park. 864 F.2d at 190.[13] In language nearly identical to MCC §§ 6-10-2's and 6-1-23's definitions of "camping," the challenged regulation's definition of "camping" also "list[ed] several indicia of 'camping'":

> Camping is defined as the use of park land for living accommodation purposes such as sleeping activities, or making preparations to sleep (including the laying down of bedding for the purpose of sleeping), or storing personal belongings, or making any fire, or using any tents or shelter or other structure or vehicle for sleeping or doing any digging or earth breaking or carrying on cooking activities. The above-listed activities constitute camping when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation regardless of the intent of the participants or the nature

---

[13] The plaintiffs in *Thomas* were not involuntarily homeless—they had "access to and use of a nearby apartment" but chose not to sleep there. *Id.* at 190.

of any other activities in which they may also be engaging . . . . *Id.* (quoting 36 C.F.R. § 7.96(i)(1) (1988)). The D.C. Circuit held that "the anti-camping regulation was not unconstitutionally vague." *Id.* at 196. Largely relying on the presence of the "indicia" of camping in the regulation's definition of "camping," the D.C. Circuit held that those indicia "indicate what is meant by 'use of park land for living accommodation purposes.'" *Id.* at 197. Here, the Challenged Ordinances supply similar indicia. The D.C. Circuit also emphasized that language within the regulation providing that "[t]he above-listed activities constitute camping when it reasonably appears, in light of all the circumstances, that the participants, in conducting these activities, are in fact using the area as a living accommodation" supplied relevant "context, and a contextual evaluation of many of the listed factors, determines the scope of the regulation." *Id.* The Challenged Ordinances use nearly identical contextual language.

The D.C. Circuit also held that "nothing in the terms of the regulation implicitly confers undue discretion upon Park Service officials." *Id.* at 199. "While officers on the enforcement front-lines are left with some ordinary discretion over what falls within the enactment, they nonetheless must justify their action by the terms of the regulation. . . . [T]he concept of camping, once defined as 'use of park land for living accommodation purposes,' in turn elucidated by specific indicia of that use, describes reasonably precise boundaries of the prohibited behavior. Those concepts, definitions, and indicia similarly contain and channel officials' enforcement discretion for purposes of the values secured by the Due Process Clause." *Id.* (citation omitted.) Here, too, because the Challenged Ordinances supply indicia of camping and other contextual information, they properly constrain the discretion of the City's enforcement officials.

Plaintiff's attempts to distinguish *Thomas* lack merit. For example, Plaintiff is simply incorrect that *Thomas* "did not consider the absence of a *mens rea* requirement." (Doc. 27 at 10.) In fact, *Thomas* acknowledged that the regulation—just like the Challenged Ordinances—provided that "[t]he above-listed activities constitute camping . . . *regardless of the intent of the participants* or the nature of any other activities in which

they may also be engaging." *Thomas*, 864 F.2d at 197 (emphasis added). The D.C. Circuit specifically pointed to this language as another reason why the regulation was *not* vague: "Lest any citizen unreasonably believe that the listed activities for some reason are not 'camping' when pursued for nobler ends, the regulation seeks to put them, too, on clear notice as to its scope." *Id.* Regardless, "[t]he Constitution does not require a knowingly criminal mind in order that an act be punished as criminal." *United States v. Hoyland*, 914 F.2d 1125, 1128 (9th Cir. 1990). Plaintiff is also incorrect that *Thomas* only applied to Lafayette Park, whereas the Challenged Ordinances "cover all parks, sidewalks, and public spaces citywide." (Doc. 27 at 10.) In fact, the regulation at issue in *Thomas* forbade "'camping' in areas *including* Lafayette Park." 864 F.2d at 190 (emphasis added). *See also* 36 C.F.R. § 7.96 ("National Capital Region").

As another example, in *Joel*, the plaintiff, a homeless man, challenged an Orlando ordinance that "prohibit[ed] 'camping' on public property." 232 F.3d at 1355. The Orlando ordinance defined "camping" as "(a) Sleeping or otherwise being in a temporary shelter out-of-doors; or (b) Sleeping out-of-doors; or (c) Cooking over an open flame or fire out-of-doors." *Id.* at 1356. Furthermore, Orlando "promulgated a handbook," called the MUCOB, that clarified that sleeping was not enough to constitute a violation; rather, there had to "be some indication of actual camping"—and the MUCOB proceed to outline certain indicia of "camping." *Id.* Among other things, the plaintiff challenged the Orlando ordinance on the grounds that that it was "impermissibly vague" and that its vagueness "has led to arbitrary application of it by [Orlando] police officers." *Id.* at 1359. The Eleventh Circuit disagreed, concluding that the Orlando ordinance—when "read in context," particularly in light of the indicia of camping in the MUCOB—was "sufficiently specific that a person of ordinary intelligence could reasonably understand the conduct that is prohibited." *Id.* at 1360. The court also held that the Orlando ordinance did not "encourage arbitrary and discriminatory enforcement." *Id.* Pointing again to the guidelines in the MUCOB setting forth certain indicia of "camping," the court held that "[t]hose guidelines substantially decrease the likelihood that [the Orlando ordinance] will be subject

- 38 -

to arbitrary and discriminatory enforcement." *Id.* Here, too, the Challenged Ordinances do not prohibit sleeping under any circumstances and require that there be some indication, other than sleeping itself, that the person is "using the area for the purpose of living accommodations." MCC §§ 6-1-23(B), 6-10-2. And as noted, the Challenged Ordinances also provide several indicia of camping.

The court in *Joel* also held that "[t]he fact that the vast majority of people arrested for violating the ordinance are homeless does not, by itself, show that City police officers discriminate against homeless persons in enforcement of the ordinance" because "[i]t seems entirely reasonable to conclude that homeless persons would be more likely to engage in the type of conduct prohibited by the ordinance and would therefore constitute the majority of people arrested for violating its provisions." *Id.* at 1360 n.5. Accordingly, the SAC's conclusory allegations that the Challenged Ordinances "facilitate[] discriminatory enforcement against vulnerable populations, including the homeless" and "disproportionately impact[] individuals without permanent housing" (Doc. 15 ¶¶ 89, 94) do not, on their own, establish that the Challenged Ordinances encourage arbitrary and discriminatory enforcement.

As yet another example, in *Bell v. City of Boise*, 834 F. Supp. 2d 1103 (D. Idaho 2011), *rev'd on other grounds*, 709 F.3d 890 (9th Cir. 2013), the plaintiffs, "all currently or formerly homeless individuals residing in Boise," alleged that the defendants "enforce Boise City ordinances against camping and sleeping in public to force the homeless of out Boise." *Id.* at 1105. Similar to the Challenged Ordinances, the Boise ordinance made "it a crime for any person 'to use any of the streets, sidewalks, parks or public places as a camping place at any time'" and further defined "camping" with reference to certain "[i]ndicia," including "storage of personal belongings, using tents or other temporary structures for sleeping or storage of personal belongings, carrying on cooking activities or making any fire in an unauthorized area, or any of these activities in combination with one another or in combination with either sleeping or making preparations to sleep (including the laying down of bedding for the purpose of sleeping)." *Id.* Among other things, the

plaintiffs challenged the Boise ordinance as "unconstitutionally vague," but the court disagreed, holding that the presence of "indicia of camping" in the ordinance's definition of "camping" was "adequate to put the public on notice of what conduct is prohibited." *Id.* at 1114-15. The court further held that the Boise ordinance was "not so vague as to encourage discriminatory enforcement," even though "the homeless are more likely than those with housing to be present in public places with their belongings." *Id.*[14]

Of course, the above-cited authorities are persuasive but not binding here. The closest binding authority the Court has located is *Desertrain*, 754 F.3d 1147. There, the plaintiffs were "four homeless individuals" who challenged a Los Angeles ordinance that provided: "No person shall use a vehicle parked or standing upon any City street, or upon any parking lot owned by the City of Los Angeles and under the control of the City of Los Angeles or under the control of the Los Angeles County Department of Beaches and Harbors, *as living quarters* either overnight, day-by-day, *or otherwise.*" *Id.* at 1149 (emphasis added). The Ninth Circuit held that this ordinance failed "to provide adequate notice of the conduct it criminalizes" because it failed to define what it meant to use a vehicle as "living quarters" and failed to specify "how long—or when—is 'otherwise.'" *Id.* at 1155. The Ninth Circuit also held that this ordinance was unconstitutionally vague because it encouraged arbitrary or discriminatory enforcement by "pav[ing] the way for law enforcement to target the homeless." *Id.* at 1157. The court acknowledged that officers were "instructed" verbally and in informal memoranda "to look for vehicles containing possessions normally found in a home, such as food, bedding, clothing, medicine, and basic necessities" but emphasized that despite those instructions, the statute was "broad enough to cover any driver in Los Angeles who eats food or transports personal belongings in his or her vehicle," "[y]et it appears to be applied only to the homeless." *Id.* at 1149, 1156.

---

[14] Plaintiff argues that the Challenged Ordinances' indicia of camping do not provide "clear guidance" to enforcement officials because "[i]n practice, the opposite is true" as "Plaintiff was cited and threatened solely for possessing backpacks while resting in a public park." (Doc. 27 at 9.) Plaintiff is free to challenge whether his conduct violated the Challenged Ordinances during the hearing on his citation, but his assertion that he was incorrectly cited does not establish the Challenged Ordinances are unconstitutional.

Although *Desertrain* shows that it is possible for a municipal anti-camping ordinance to be unconstitutionally vague, the vagueness analysis ultimately turns on the details. Here, the Challenged Ordinances have a feature that was conspicuously absent in *Desertrain*—they provide, in their text, several "indicia" of camping that serve to narrow and define the sorts of activities that qualify as "camping." *Cf. Thomas*, 864 F.2d at 197 ("A contextual inquiry is a matter of reasoning from and delimiting ideal types (or paradigms), and the observation that the paradigms of 'lunch nap' and 'camping' may share an element of an hour's sleep does not collapse the types or render vague the manifest distinction between them. It can be said that no distinction can be drawn between such varied acts only if no 'core concept' underlies the prohibited behavior. The lack of a 'core concept' is the hallmark of a prohibition that is unconstitutionally vague. Here, 'camping' does have such a basic or unifying concept—the use of land for living accommodation purposes—which the regulation elucidates in detail.") (citations omitted).[15]

Accordingly, Count Five is dismissed.

G.   **Equal Protection**

1.   The Parties' Arguments

Plaintiff argues in his response brief that the SAC states an Equal Protection claim. (Doc. 27 at 11.) He argues that the SAC "allege[s] that the [Challenged Ordinances] are enforced in a discriminatory manner against people perceived as unhoused." (*Id.*)

In reply, the City argues that "Plaintiff has not asserted an equal protection claim in his [SAC]"; rather, the SAC "refers to the Equal Protection Clause (SAC ¶¶ 94-95), but only in connection with [Plaintiff's] overbreadth claim, which the Court previously dismissed." (Doc. 30 at 10 n.4.) The City further argues that even if the SAC had asserted

---

[15]   Indeed, the Challenged Ordinances expressly address some of the concerns raised in *Desertrain* because they clarify that simply eating or resting does not qualify as a violation. MCC § 6-10-2 ("For the purposes of clarity, the term 'camp' or 'camping' in this Chapter 10 does not refer to the mere use of city-installed coking facilities or equipment, the possession or transportation of camping paraphernalia, or the use of a blanket for resting absent other evidence of living accommodations."); MCC § 6-1-23 ("For the purposes of clarity, the term 'Camp' or 'Camping' in this Section does not refer to the mere possession or transportation of Camping Paraphernalia, or the use of a blanket for resting, absent other evidence of living accommodations.").

- 41 -

an Equal Protection claim, "it would still fail because homeless individuals are not a protected class, and maintaining cleanliness and safety in public areas is a rational basis for the ordinances." (*Id.*)

> 2. Analysis

In light of Plaintiff's *pro se* status, the Court must construe the SAC liberally. Although the SAC does not assert a standalone claim under the Equal Protection Clause, the Court will consider the SAC as a whole to determine whether it states such a claim.

"There are several general methods by which a plaintiff may allege an equal protection violation. First, he may allege 'defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a *protected class.*'" *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1108 (E.D. Cal. 2012) (quoting *Lee v. City of Los Angeles,* 250 F.3d 668, 686 (9th Cir. 2001)). "Such actions are subjected to 'strict scrutiny' and 'will only be sustained if they are suitably tailored to serve a compelling state interest.'" *Id.* (quoting *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "Similar oversight is applied where state action impinges on personal rights, otherwise framed as fundamental rights, protected by the Constitution." *Id.* (cleaned up). "Alternatively, when a policy distinguishes one group of persons from another, that distinction must be rationally related to a legitimate governmental purpose." *Id.*[16]

Plaintiff has not alleged that he is a member of a protected class. The SAC and Plaintiff's briefing identify the homeless population as the class of people who suffer discrimination due to enforcement of the Challenged Ordinances. (Doc. 15 ¶ 94; Doc. 27 at 11.) But "no court has ever held the homeless to be a suspect class." *Sanchez*, 914 F. Supp. 2d at 1108. *See also Raiser*, 2020 WL 6392846 at *5 ("[H]omeless individuals are not a protected class."); *Davison*, 924 F. Supp. at 993 ("[N]o court has ever held the homeless to be a suspect class. On the contrary, the circuits that have addressed the issue are in accord that the homeless are not a suspect class."). Nor has Plaintiff identified a

---

[16] An equal protection claim can also be brought under a "class of one" theory, *Sanchez*, 914 F. Supp. 2d at 1108, but Plaintiff is not pursuing such a theory here.

fundamental right implicated by enforcement of the Challenged Ordinances.

"Accordingly, the level of scrutiny to be applied to government action that discriminates on the basis of homelessness is rational review." *Davison*, 924 F. Supp. at 993. MCC § 6-1-23 identifies purposes it is meant to effectuate, including "to maintain City property in a clean, sanitary and accessible condition, and to adequately protect the health, safety, and welfare of the community." *Id.* These purposes "withstand this relatively relaxed constitutional scrutiny." *Davison*, 924 F. Supp. at 993. *See also Joel*, 232 F.3d at 1357-58 (rejecting Equal Protection challenge to anti-camping ordinance because "[h]omeless persons are not a suspect class, nor is sleeping out-of-doors a fundamental right" and noting that "a rational basis exists for believing that prohibiting sleeping out-of-doors on public property would further aesthetics, sanitation, public health, and safety"); *Bilodeau v. City of Medford*, 2024 WL 1470516, *9 (D. Or. 2024), *report and recommendation adopted*, 2024 WL 1462328 (D. Or. 2024) (identifying "aesthetics, sanitation, public health, safety, and environmental quality" as "legitimate concerns that form a rational basis for the [Camping] Ordinance").

Finally, a plaintiff asserting an equal protection claim "may also allege selective enforcement of the ordinance at issue." *Bilodeau*, 2024 WL 1470516 at *9. It appears, at least based on his briefing, that Plaintiff believes he has asserted a claim under this theory. (Doc. 27 at 11 ["Selective enforcement based on perceived housing status falls squarely within this principle."].) But "[t]o show selective enforcement, a plaintiff 'must demonstrate that enforcement had a discriminatory effect and the police were motivated by a discriminatory purpose.'" *Bilodeau*, 2024 WL 1470516 at *9 (quoting *Rosenbaum v. City and Cnty. of San Francisco*, 484 F.3d 1142, 1152 (9th Cir. 2007)). "Further, plaintiffs seeking to enjoin enforcement must demonstrate that the selective enforcement is part of a policy, plan, or pervasive pattern." *Id.* (cleaned up). The SAC is deficient under these standards because it does not adequately allege a discriminatory effect. "The standard for proving discriminatory effect is a demanding one. Yet, to state a claim, [a plaintiff] need only allege some facts, either anecdotal or statistical, demonstrating that similarly situated

defendants could have been prosecuted, but were not." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 920 (9th Cir. 2012) (en banc) (cleaned up). The SAC, at most, alleges that on one occasion, Plaintiff asked rangers who approached him "why he was being singled out while others in the park were not questioned." (Doc. 15 ¶ 39.) However, the SAC does not allege that other non-homeless people in the park were engaged in the same activities in the park as Plaintiff yet avoided enforcement. The SAC therefore fails to allege sufficient facts to support a selective enforcement claim.

Accordingly, to the extent the SAC attempts to assert a claim under the Equal Protection Clause, that claim is dismissed.

IV.    Leave to Amend

Plaintiff does not request leave to amend. Nevertheless, the rule in the Ninth Circuit is that "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (citation omitted). The decision whether to grant leave to amend is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which "advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). "This policy is 'to be applied with extreme liberality.'" *Id.* (citation omitted). Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006). Additionally, "[a] district court should not dismiss a pro se complaint without leave to amend unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012) (cleaned up). "[B]efore dismissing a pro se complaint the district court must provide the litigant with notice of the deficiencies in his complaint in order to ensure that the litigant uses the opportunity to amend effectively." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992), *as amended* (May 22, 1992).

Amendment as to Counts One, Three, and Four would be futile because Plaintiff has not alleged a constitutionally protected liberty interest of which he was deprived. Amendment as to Count Five would also be futile because the Challenged Ordinances are not, as a matter of law, unconstitutionally vague. In contrast, to the extent Plaintiff is able to plead additional facts to support that he was "seized" under the Fourth Amendment, the Court will allow him to amend Count Two. The Court will also allow Plaintiff to amend his complaint to allege additional facts intended to support an Equal Protection claim under a selective enforcement theory.

Accordingly,

**IT IS ORDERED** that:

1.     The City's motion to dismiss (Doc. 25) is **granted**.

2.     Plaintiff's motion for leave to file a surreply (Doc. 32) is **denied**.

3.     Within 14 days of the issuance of this order, Plaintiff may file a TAC. The changes shall be limited to attempting to cure the deficiencies in Count Two identified in this order. Plaintiff may also allege additional facts to support the assertion of an Equal Protection claim consistent with this order. If Plaintiff chooses to file a TAC, Plaintiff shall, consistent with LRCiv 15.1, attach a redlined version of the pleading as an exhibit.

4.     If Plaintiff does not file a TAC within 14 days of the issuance of this order, the Clerk shall enter judgment accordingly and terminate this action.

Dated this 9th day of March, 2026.

_____
Dominic W. Lanza
United States District Judge

- 45 -