**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Carl Cuagliotti,

            Plaintiff,

v.

City of Mesa, et al.,

            Defendant.

No. CV-24-02970-PHX-DWL

**ORDER**

The City of Mesa ("the City") has enacted municipal ordinances that prohibit camping in City parks and on City property.[1] In his Second Amended Complaint ("SAC"), *pro se* Plaintiff asserted an array of constitutional challenges to the Challenged Ordinances, arguing that they violate his Fourteenth Amendment substantive due process rights, his Fourteenth Amendment procedural due process rights, and his Fourth Amendment right to be free from unlawful seizure and that they are also unconstitutionally vague. (Doc. 15.)

On March 9, 2026, the Court issued an order granting the City's motion to dismiss all claims in the SAC ("the Order Dismissing the SAC"). (Doc. 34.) Additionally, "[i]n light of Plaintiff's *pro se* status," the Court "construe[d] the SAC liberally" and separately addressed whether it stated a claim under the Equal Protection Clause, concluding that "to the extent the SAC attempts to assert [such a claim], that claim is dismissed." (*Id.* at 42-44.) Finally, although Plaintiff did not request it, the Court also granted limited leave to

---

[1] Those ordinances are MCC § 6-10-4(V), MCC § 6-10-2, and MCC § 6-1-23 and will be referred to herein as the "Challenged Ordinances." (Doc. 34 at 4-7.)

amend—Plaintiff was authorized (1) "to plead additional facts to support that he was 'seized' under the Fourth Amendment" and (2) "to amend his complaint to allege additional facts intended to support an Equal Protection claim under a selective enforcement theory." (*Id.* at 45.)

On March 18, 2026, Plaintiff filed the Third Amended Complaint ("TAC"). (Doc. 35.) The City has, in turn, again moved to dismiss. (Doc. 37.) Plaintiff has separately filed a motion for leave to file a surreply (Doc. 40) and to stay the enforcement of a citation that was issued against him for violating one of the Challenged Ordinances (Doc. 43). The three pending motions are now fully briefed (Docs. 38, 39, 46, 47) and neither side requested oral argument. For the reasons that follow, the City's motion to dismiss is granted and Plaintiff's motions are denied.

**BACKGROUND**

I.      Relevant Factual Background

The parties are familiar with the relevant facts of this case, which are outlined in the Order Dismissing the SAC. (Doc. 34.) The following new allegations were either added, reworded, or altered in the TAC:[2]

A.      **November 2024 Encounter**

During the November 2024 encounter, "Plaintiff asked the rangers why he was being singled out while other individuals in the park—who were also present with backpacks and belongings—were not being questioned or ordered to leave. The rangers responded that the others were 'recreating,' implicitly acknowledging that Plaintiff was being targeted not for his conduct, but for his status as an unhoused individual. The rangers' distinction between 'recreating' (housed persons) and 'unauthorized presence' (Plaintiff) had no basis in the ordinance, which prohibits camping for all persons equally." (Doc. 35 ¶ 40.) The TAC alleges that "[t]his arbitrary distinction based solely on perceived housing status violates the Equal Protection clause." (*Id.*) The TAC also alleges that "[t]he rangers then explicitly revealed their discriminatory intent by stating: 'When one homeless

---

[2]      *See, e.g.*, Doc. 35-1 (redline showing changes from SAC to TAC).

person is present, they all start congregating'—a statement evidencing stereotyping and animus toward unhoused individuals as a group" and which "demonstrates that the rangers subjected Plaintiff to heightened scrutiny and enforcement based not on individualized suspicion of wrongdoing, but on group-based stereotyping prohibited by the Equal Protection Clause." (*Id.* ¶ 41.)

The TAC also adds several facts and arguments related to the rangers allegedly accusing Plaintiff of being a "repeat offender" and further alleges that "[t]his accusation was false—Plaintiff had not been previously warned, cited, or approached by rangers in any other park." (*Id.* ¶¶ 42-43.) "After Plaintiff demonstrated that he was not a repeat offender and had committed no violation, the first ranger explicitly threatened that if Plaintiff did not comply, he would be banished from the park and cited under MCC [§] 6-10-4(V) for the number of bags he had," and "[t]his threat was issued despite Plaintiff not meeting the objective criteria for a citation (he was not camping, was alert and studying, and had not been previously warned or cited)." (*Id.* ¶ 44.)

"Faced with the imminent threat of (1) banishment from the park, (2) criminal citation under MCC [§] 6-10-4(V), and (3) the rangers' clear demonstration that they would fabricate justifications for enforcement, Plaintiff had no real choice but to comply." (*Id.* ¶ 45.) The TAC alleges that "Plaintiff's 'consent' to leave was not voluntary; it was *coerced* through threats of criminal sanction and banishment obtained through pre-textual investigation and false accusation" and that "Plaintiff was deterred from exercising his right to remain in a public forum based on threats of prosecution that the rangers manufactured through discriminatory stereotyping and false allegations." (*Id.*)

B.     **October 2025 Encounter**

The TAC adds allegations regarding a new encounter that occurred in October 2025. The TAC alleges that "[t]he pattern of selective enforcement, discriminatory targeting, and coercive banishment of Plaintiff based on his unhoused status has continued throughout the pendency of this litigation." (*Id.* ¶ 55.) Specifically, "[o]n or about October 27, 2025, Plaintiff was present at a public park in Mesa, Arizona, lawfully organizing his personal

belongings and studying reference materials when a City of Mesa police officer approached him, questioned his presence, and stated: 'this is not a place for all your stuff' and 'you should go to the library.'" (*Id.* ¶ 56.) "When Plaintiff inquired if there was an ordinance that was against having his stuff, the officer offered no legitimate basis related to any observed violation of law." (*Id.* ¶ 57.) "Plaintiff then stated, 'go ahead, give me a ticket'— explicitly inviting lawful enforcement if any violation actually existed." (*Id.*) "The officer refused to issue a citation." (*Id.*) "Instead, the officer stated that Plaintiff had to leave the park 'simply because she said to,'" and the TAC alleges that this was a "naked exercise of arbitrary authority targeted at Plaintiff because of his unhoused status." (*Id.*) The TAC alleges that "[t]he only basis for the officer's demand was Plaintiff's appearance as an unhoused person organizing personal belongings in a public space—conduct that, as alleged above, housed individuals engage in daily without interference." (*Id.* ¶ 58.) Specifically, the TAC alleges that "[a]t the same time and location, the same officer intentionally ignored other park patrons who appeared housed but who were also present with backpacks and personal belongings" and thus "the officer engaged in selective enforcement by only targeting individuals who appeared unhoused while permitting similarly situated housed individuals to remain undisturbed." (*Id.* ¶ 59.)

The TAC also alleges that "[t]he officer's directive that Plaintiff 'should go to the library' constitutes constructive banishment." (*Id.* ¶ 60.) And the TAC alleges that the "[t]he library is not a substitute for public park access." (*Id.*) The TAC alleges that this incident "proves that Plaintiff faces a credible threat of future pretextual enforcement based solely on his unhoused status." (*Id.* ¶ 61.) The TAC further alleges that, during this encounter, "Plaintiff lawfully declined to be banished from the park absent a lawful basis" and that "the officer threatened him with continued surveillance, stating: 'We'll be watching you then.'" (*Id.* ¶ 102.)

C.    **Fourth Amendment Seizure**

The TAC alleges that the City enforces the Challenged Ordinances "in a manner that restrains Plaintiff's liberty and freedom of movement through an ongoing show of

governmental authority backed by criminal penalties." (*Id.* ¶ 65.) "Under the City's enforcement regime," Plaintiff alleges that he "is repeatedly confronted by park rangers and other officials and presented with the following coercive trilemma: a. Submit to placement in City-approved shelter, mental health, or rehabilitation programs that not only impose restrictive conditions—including curfews, supervision, and limitations on movement—but also expose individuals to documented risks of violence, unsafe conditions, and lack of adequate services; b. Receive criminal citations and face prosecution, fines, and potential arrest for engaging in life-sustaining conduct in public; or c. Leave or be expelled from public spaces within the City, effectively facing constructive banishment." (*Id.* ¶ 66.) "Faced with these options and the credible threat of citation or arrest, Plaintiff has repeatedly altered his conduct and complied with directives issued by City officials, including leaving public spaces and modifying his behavior to avoid criminal punishment." (*Id.* ¶ 67.) "The City's enforcement regime therefore restrains Plaintiff's liberty through a continuous show of governmental authority." (*Id.* ¶ 68.) "The City's enforcement of the Challenged Ordinances functions as a system of constructive custody. Plaintiff's freedom of movement is conditioned on submission to restrictive government-approved programs or compliance with directives backed by criminal penalties." (*Id.* ¶ 69.) The TAC proceeds to allege, at length, why these government-approved services are not a suitable alternative to remaining in City parks. (*Id.* ¶¶ 69-74.)

The TAC also alleges that "[u]nlike a brief or isolated police encounter, the Challenged Ordinances city-wide regulatory regime . . . criminalizes Plaintiff's presence in public spaces when he engages in basic life-sustaining conduct such as resting or possessing personal belongings." (*Id.* ¶ 76.) "Under this regime, Plaintiff cannot simply avoid police encounters by moving elsewhere within the City, because the same criminal prohibitions apply to virtually all public spaces," and "a reasonable person in Plaintiff's position would not feel free to disregard the commands of City officials or continue ordinary activities in public space." (*Id.* ¶ 77.) "The City's repeated orders to leave public areas under threat of citation are therefore not isolated dispersal commands but part of an

ongoing enforcement system that restrains Plaintiff's liberty and movement across the City. This restraint operates through a continuous show of authority backed by criminal penalties and credible threats of enforcement.  This is not a consensual encounter, as an officer's conduct communicates that compliance is not optional but required." (*Id.* ¶ 78.)  "The City's enforcement scheme effectively directs Plaintiff's movement and behavior by making lawful, life-sustaining activities impossible in public spaces and by coercing submission to restrictive and dangerous government programs," "[c]onstructive banishment from public spaces further restrains Plaintiff's liberty," and "[b]y expelling Plaintiff from public areas under threat of criminal prosecution and preventing him from returning, the City interferes with Plaintiff's ability to remain in places where he is otherwise lawfully present." (*Id.* ¶¶ 79-80.)  The TAC argues that "[b]y enforcing the Challenged Ordinances through a coercive system that restricts Plaintiff's freedom of movement and compels submission to dangerous, government-controlled living arrangements under threat of criminal punishment, the City has subjected Plaintiff to an ongoing and unreasonable seizure of his person." (*Id.* ¶ 84.)

D. **Equal Protection**

The TAC alleges that the City, "acting under color of state law, [has] enforced and continue[s] to enforce the City's ordinances, policies, and customs in a manner that intentionally and irrationally discriminates against Plaintiff based on his unhoused status, thereby violating his right to equal protection of the laws." (*Id.* ¶ 88.)  The TAC then purports to set forth the legal standard for a "class of one" Equal Protection claim. (*Id.* ¶ 89.)

The TAC alleges that the City has "engaged in a persistent and ongoing pattern of conduct that selectively and arbitrarily targets Plaintiff for harassment, citation, and exclusion from public spaces, while intentionally ignoring housed individuals who are similarly situated and engaged in identical, lawful conduct." (*Id.* ¶ 90.)  "This pattern includes, but is not limited to: a. In November 2024, a City ranger ordered Plaintiff to leave a public park for allegedly 'camping' while he was awake, alert, and studying with his

belongings. The ranger ignored similarly situated housed students and other park patrons who also possessed backpacks and personal items. b. On January 23, 2025, a City ranger harassed Plaintiff and ordered him to maintain an 'erect posture,' effectively criminalizing the act of closing one's eyes or appearing to rest, a standard not applied to any housed person in a City park. c. Following the January 23, 2025 citation, [the City] unlawfully banished Plaintiff a public park in the City . . . for one month, a punitive and arbitrary exclusion not imposed on housed individuals cited for minor municipal infractions." (*Id.* ¶ 91.)

The TAC next alleges that "the City has actual and constructive knowledge that its park rangers have engaged in a pattern and practice of targeting unhoused individuals for harassment and selective enforcement" based on evidence of an alleged "Goon Squad" formed by several City rangers who allegedly targeted homeless individuals and people of color. (*Id.* ¶¶ 92-97.)

The TAC alleges that "Plaintiff was and is similarly situated to countless individuals in Mesa who use public parks while possessing personal belongings. These individuals include students, tourists, picnickers, and families. The only material difference between Plaintiff and these comparators is that Plaintiff is unhoused." (*Id.* ¶ 105.) The TAC alleges that the City "intentionally and systematically treated Plaintiff differently from those similarly situated individuals" because both Plaintiff, who is "unhoused," and the "housed comparators" were present with backpacks/belongings, organizing/resting in public, and not "camping" or erecting a structure. (*Id.* ¶ 106.) The TAC alleges that "[t]here is no rational basis for [the City's] differential treatment of Plaintiff. No legitimate government interest is advanced by a policy that allows a housed student to study with a backpack in a park but subjects an unhoused person engaged in the exact same activity to harassment and banishment. The City's interest in public health and safety is not rationally served by targeting individuals based on their housing status rather than their conduct. The targeting of Plaintiff is based on irrational animus and stereotypes against unhoused people, viewing their presence as inherently undesirable . . . ." (*Id.* ¶¶ 108-09.)

II.     Procedural History

On October 29, 2024, Plaintiff initiated this action.  (Doc. 1.)

On November 13, 2024, Plaintiff filed the First Amended Complaint.  (Doc. 5.)

On April 17, 2025, Plaintiff filed the SAC.  (Doc. 15.)

On March 9, 2026, the Court issued the Order Dismissing the SAC, which granted Plaintiff limited leave to amend to "to plead additional facts to support that he was 'seized' under the Fourth Amendment" and "to allege additional facts intended to support an Equal Protection claim under a selective enforcement theory."  (Doc. 34 at 45.)

On March 18, 2026, Plaintiff filed the TAC.  (Doc. 35.)

On April 1, 2026, the City moved to dismiss the TAC.  (Doc. 37.)  That motion is now fully briefed.  (Docs. 38, 39.)

On April 30, 2026, Plaintiff filed a motion for leave to file a surreply to the pending motion to dismiss and lodged his proposed surreply.  (Docs. 40, 41.)

On May 11, 2026, Plaintiff filed a notice of supplemental fact.  (Doc. 42.)  That same day, Plaintiff filed a motion to stay enforcement of a citation issued against him under the Challenged Ordinances.  (Doc. 43.)  On May 19, 2026, Plaintiff filed a motion to expedite his motion to stay (Doc. 44), which the Court denied (Doc. 45).  The motion to stay is now fully briefed.  (Docs. 46, 47.)

On June 8, 2026, Plaintiff filed a notice of supplemental fact.  (Doc. 48.)

On June 10, 2026, Plaintiff filed a notice of supplemental fact.  (Doc. 49.)

On June 19, 2026, Plaintiff filed a notice of supplemental fact.  (Doc. 50.)

**DISCUSSION**

I.      Plaintiff's Motion To Stay Enforcement

Plaintiff "moves this Court for an order staying enforcement of the citation issued against him [on May 29, 2026] under [MCC] § 6-10-4(V), pending resolution of this action."  (Doc. 43 at 1.)  However, after the motion became fully briefed (Docs. 46, 47), Plaintiff filed a "Notice of Dismissal," notifying the Court that he "appeared before the Mesa Municipal Court regarding the citation that is the subject of [his] pending Motion to

Stay," that "the prosecutor informed the court that dismissal of the citation was being recommended," and that "[t]he Mesa Municipal Court thereafter dismissed the citation" (Doc. 49 at 2). Because the citation that is the subject of Plaintiff's motion to stay enforcement has been dismissed, Plaintiff's motion to stay is denied as moot.

II.     Plaintiff's Motion For Leave To File A Surreply

"Sur-replies are highly disfavored and permitted only in extraordinary circumstances." *Fitzhugh v. Miller*, 2020 WL 1640495, *9 (D. Ariz. 2020) (cleaned up). "Although the Court may in its discretion allow the filing of a surreply, this discretion should be exercised in favor of allowing a surreply only where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief." *Id.* (citation omitted).

Plaintiff "moves for leave to file a surreply in response to [the City's] Reply in support of its Motion to Dismiss" and contends that "[g]ood cause exists here for three independent reasons." (Doc. 40 at 1-2.) First, Plaintiff argues that the City's reply "asserts that Plaintiff 'did not intend to raise the class of one theory' and argues that the Court should not consider such a claim," but "[t]his reframing was not the basis of [the City's] opening Motion and shifts the focus of the Equal Protection analysis." (*Id.* at 3.) Plaintiff argues that "[a] surreply is necessary to clarify the scope of Plaintiff's claim as pleaded in the TAC and addressed in Plaintiff's opposition." (*Id.*) Plaintiff's argument is without merit. The City's motion to dismiss argues that the TAC attempts to raise an Equal Protection claim under a "class of one" theory, in addition to an Equal Protection claim under a "selective enforcement" theory, and that the "class of one" claim (1) exceeds the scope of the limited leave to amend granted to Plaintiff in the Order Dismissing the SAC and (2) also fails on the merits. (Doc. 37 at 12-14.) In his response brief, Plaintiff clarifies that the TAC asserts "a classic selective enforcement claim, not a pure 'class-of-one' theory" and asserts that the TAC's Equal Protection "claim falls squarely in the [selective-enforcement] category." (Doc. 38 at 10.) In reply, the City does not raise any "new" arguments about Plaintiff's "class of one" theory—instead, the City responds to Plaintiff's

assertion that "he did not intend to raise the class of one theory" and therefore argues that "the Court should not consider" such a theory. (Doc. 39 at 2.) As explained in the Order Dismissing the SAC, the fact that the City "simply respond[ed] to arguments that Plaintiff made in his response brief" is not grounds for Plaintiff to file a surreply. (Doc. 34 at 10.) *See also Sawicky v. AMC Networks Inc.*, 2018 WL 11292263, *1 (C.D. Cal. 2018), *aff'd*, 753 F. App'x 501 (9th Cir. 2019) ("Sawicky requests leave to file a sur-reply in support of this motion based on AMC's 'misinterpreted arguments.' All of AMC's arguments on reply are in direct response to Sawicky's opposition. It appears Sawicky seeks a second bite at the apple but does not show good cause to do so. Therefore, her request is denied.").

Second, Plaintiff argues that the City's "Reply also asserts that Plaintiff was engaged in 'criminalized conduct' and therefore not similarly situated to other individuals," which is incorrect because "the TAC expressly alleges that Plaintiff was not camping, but instead was awake and studying with his belongings," and "[b]ecause [the City's] argument depends on a characterization that conflicts with the pleaded facts . . . a surreply is necessary to address this issue and clarify the record." (Doc. 40 at 3-4.) This argument is without merit for two reasons. First, the City raised the same argument in its opening brief (Doc. 37 at 8-9), so it is not a "new" argument raised for the first time in reply. Second, it is the Court's job to faithfully apply the Rule 12(b)(6) standard and construe all well-pleaded factual allegations in Plaintiff's favor. A surreply is not necessary for the Court to apply the familiar Rule 12(b)(6) standard to a fully briefed motion.

Third, Plaintiff argues that the City's reply fails to address the TAC's "allegations supporting discriminatory intent and a municipal policy or custom." (Doc. 40 at 4.) But Plaintiff does not cite, nor is the Court aware of, any authority that authorizes a surreply because a reply purportedly fails to address arguments.

Accordingly, Plaintiff's motion for leave to file a surreply is denied.

III.    The City's Motion To Dismiss The TAC

A.    **Legal Standard**

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the Court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

### B. **Fourth Amendment Seizure**

#### 1. The Parties' Arguments

The City argues that "[t]he Fourth Amendment claim fails because Plaintiff failed to add any new facts showing an unlawful 'seizure.'" (Doc. 37 at 3.) The City emphasizes that the Order Dismissing the SAC "noted that Plaintiff never alleged he was subjected to physical force . . . and concluded that park rangers giving Plaintiff the options of accepting services, receiving a citation, or being expelled from the park does not amount to a 'seizure.'" (*Id.* at 4.) The City further emphasizes that the Order Dismissing the SAC "added that the show-of-authority theory failed for other reasons, including that Plaintiff often did not comply with the rangers' orders, Plaintiff was never 'restrained' when he left the park, and a citation is not a seizure." (*Id.*) The City argues that Plaintiff has not pleaded "additional facts showing an unlawful seizure" and that the TAC simply "repleads [Plaintiff's] first three interactions with park rangers without substantive change" and without "alleg[ing] that []he was subject to physical force." (*Id.* at 4-5.) The City also argues that Plaintiff's "general theory remains the same: the enforcement of the ordinances functions as 'an ongoing' or 'continuous show of governmental authority' that effectively

leads to 'constructive banishment' or 'constructive custody,'" but "[t]he Court has already rejected this theory of a seizure." (*Id.* at 5.) Next, the City argues that the "only new allegations in the [TAC] relate to an October 2025 interaction Plaintiff had with a police officer, but those allegations similarly do not show a seizure" because "Plaintiff again does not allege that he was physically detained" and "alleges only that the officer suggested he leave the park and go to the library, but he does not allege that he submitted to an assertion of authority in any way." (*Id.*) Alternatively, the City argues that "this interaction is not an enforcement of the City's ordinances such that Plaintiff can rely on it to challenge their constitutionality" because, according to the TAC's allegations, Plaintiff "asked the officer if he was in violation of an ordinance, but the officer did not provide him with one." (*Id.* at 5 n.1.)

In response, Plaintiff argues that the City's "motion fails because it mischaracterizes both the factual allegations in the TAC and the governing legal standards at the pleading stage." (Doc. 38 at 2.) Plaintiff argues that "[c]ontrary to [the City's] assertion that no new facts were added, the TAC alleges that officers: a. Issued direct commands requiring Plaintiff to leave public property; b. Asserted authority without legal justification; and c. Caused Plaintiff to comply with those commands under threat of enforcement" and that "[t]hese allegations plausibly establish a seizure through a show of authority and submission." (*Id.*) Plaintiff argues that the City's motion "improperly asks the Court to disregard these allegations and instead draw inferences in [the City's] favor, which is impermissible on a Rule 12(b)(6) motion." (*Id.*) Next, Plaintiff argues that "[w]here no physical force is used, a seizure occurs when: a. The officer makes a show of authority, and b. The individual submits to that authority." (*Id.* at 5.) Plaintiff argues that "[p]hysical detention is not required" and "[a] command backed by authority that compels compliance is sufficient." (*Id.*) Citing the new allegations regarding the October 2025 encounter, Plaintiff argues that the TAC "alleges that officers issued commands requiring Plaintiff to leave public property without legal justification," "alleges that officers asserted authority over him and required compliance," and "further alleges that Plaintiff complied with these

commands and altered his conduct in response to police authority." (*Id.*) Plaintiff argues that "[c]ompliance with an officer's command to leave a public place constitutes submission to authority." (*Id.* at 6.) Next, Plaintiff argues that the City's "emphasis on the absence of 'physical detention' reflects a misstatement of clearly established law" because "[t]he Fourth Amendment does not require physical force." (*Id.*) Without citing any caselaw, Plaintiff argues that "[c]ourts have repeatedly recognized that commands restricting a person's movement—such as ordering an individual to leave—can constitute a seizure when compliance is compelled." (*Id.*) Plaintiff also argues that whether he "in fact submitted to authority is a factual question that cannot be resolved on a motion to dismiss" and that the "TAC plausibly alleges that Plaintiff was subjected to repeated assertions of authority and that he complied with those directives." (*Id.*) Next, Plaintiff argues that the TAC "includes additional factual detail regarding: a. The nature of the officers' commands; b. The absence of legal justification; and c. Plaintiff's compliance with those commands." (*Id.* at 7.) Plaintiff thus argues that he "has plausibly alleged that: a. Officers asserted authority over him; b. He was not free to disregard those commands; and c. He complied with those commands." (*Id.*)

In reply, the City reiterates that "Plaintiff's Fourth Amendment claim fails because he has not adequately alleged a 'seizure' within the meaning of the Fourth Amendment." (Doc. 39 at 1.) The City also reiterates that the TAC's "amendments . . . do not cure the deficiencies identified" in the Order Dismissing the SAC. (*Id.*) Next, the City responds to Plaintiff's argument "that his newly alleged facts are sufficient to salvage this claim," arguing that the TAC's "new allegations are merely that a police officer suggested he leave the park and go the library." (*Id.*) Thus, the City argues "[t]he Court should dismiss the claim again, this time with prejudice, as Plaintiff has demonstrated he cannot cure the deficiencies identified by the Court." (*Id.* at 2.)

    2. <u>Analysis</u>

The TAC's Fourth Amendment claim fails because there continues to be "no plausible allegation that the Challenged Ordinances result in the sort of 'seizure'

contemplated by the Fourth Amendment." (Doc. 34 at 21.) "The 'seizure' of a 'person' can take the form of physical force or a show of authority that in some way restrains the liberty of the person." *Puente v. City of Phoenix*, 123 F.4th 1035, 1051 (9th Cir. 2024) (quoting *Torres v. Madrid*, 592 U.S. 306, 311 (2021)).

Once again, the TAC does not allege that Plaintiff was ever subjected to physical force. *Cf. California v. Hodari D.*, 499 U.S. 621, 625 (1991) ("The present case . . . does not involve the application of any physical force; Hodari was untouched by Officer Pertoso at the time he discarded the cocaine.").

Nor do the allegations in the TAC support a Fourth Amendment seizure claim under a show-of-authority theory. The TAC continues to rely on the same "seizure" theory as the SAC—i.e., that Plaintiff's encounters with park rangers present him with three options: (1) accept shelter, mental health, and/or rehabilitation services; (2) receive a citation for violating the Challenged Ordinances; or (3) face arrest or expulsion/banishment from public space. (*Compare* Doc. 35 ¶ 28 *with* Doc. 15 ¶ 27.) The TAC adds allegations reiterating this "trilemma" theory and then alleges, in conclusory fashion, that "[f]aced with these options and the credible threat of citation or arrest, Plaintiff has repeatedly altered his conduct and complied with directives issued by City officials, including leaving public spaces and modifying his behavior to avoid criminal punishment." (Doc. 35 ¶¶ 66-67.) The TAC refers to this "trilemma" as "a system of constructive custody" and proceeds to outline several ways in which shelter services are restrictive and dangerous. (Doc. 35 ¶¶ 66, 69-74.) At bottom, the TAC's theory of "constructive custody" premised on Plaintiff being given three options—complying with an officer's directives, facing a citation, or getting arrested/leaving the park—is no different than the theory presented in the SAC. As the Order Dismissing the SAC explained, "the presentation of such options by a law enforcement officer does not amount to a seizure." (Doc. 34 at 24.)

The Order Dismissing the SAC also explained why Plaintiff's various encounters with park rangers in October 2024, November 2024, and April 2025, as described in the SAC, "fail[ed] to allege a seizure under a show-of authority theory for other reasons." (*Id.*)

- 14 -

As for the October 2024 encounter, the TAC adds no new allegations to support that this encounter was a "seizure." (Doc. 35 ¶ 35. *See also* Doc. 35-1 at 9 [redline].)  Accordingly, the October 2024 encounter does not constitute a "seizure" for the same reasons identified in the Order Dismissing the SAC.  (Doc. 34 at 24-25.)

As for November 2024 encounter, the TAC largely adds allegations intended to support Plaintiff's Equal Protection claim, not his Fourth Amendment claim.  (Doc. 35 ¶¶ 36-46. *See also* Doc. 35-1 at 10-12 [redline].)  The TAC, although re-worded, continues to allege that this encounter was a seizure because Plaintiff was "[f]aced with the imminent threat of (1) banishment from the park, (2) criminal citation under MCC [§] 6-10-4(V), and (3) the rangers' clear demonstration that they would fabricate justifications for enforcement," so "Plaintiff had no real choice but to comply."  (Doc. 35 ¶ 45.)  And the TAC now alleges that "Plaintiff's 'consent' to leave was not voluntary" because "it was *coerced* through threats of criminal sanction and banishment."  (*Id.*)  The November 2024 encounter does not constitute a "seizure" for the same reasons identified in the Order Dismissing the SAC.  (Doc. 34 at 25.)

As for the April 2025 encounter, the TAC adds no allegations to support that Plaintiff was "seized" per the Fourth Amendment.  (Doc. 35 ¶¶ 47-54. *See also* Doc. 35-1 at 12-14 [redline].)  Thus, the April 2025 encounter also does not constitute a "seizure" for the same reasons identified in the Order Dismissing the SAC.  (Doc. 34 at 25.)

The TAC adds allegations regarding an additional encounter in October 2025.  (Doc. 35 ¶¶ 55-62.)  This encounter, too, is not a "seizure."  The TAC simply alleges that Plaintiff was told by an officer that he should leave the park and go to the library.  The TAC does not allege that Plaintiff complied with this directive (to the extent it can even be considered a "directive"), so it is not a "seizure." *Hodari*, 499 U.S. at 629 (no seizure under show-of-authority theory if the person does not comply).[3]  Moreover, as the Order Dismissing the

---

[3]    Plaintiff argues in his response brief that he "complied with these commands." (Doc. 38 at 5.)  In support, Plaintiff cites paragraph 67 of the TAC. (*Id.*)  But paragraph 67 does not refer specifically to the October 2025 incident and instead simply asserts, in conclusory fashion, that "Plaintiff has repeatedly altered his conduct and complied with directives issued by City officials, including leaving public spaces and modifying his behavior" and that "[s]uch compliance constitutes submission to a show of authority within

SAC explained, "when officers order persons to leave public areas, such police conduct, without more, is not a seizure under the Fourth Amendment as long as the person is otherwise free to go where he wishes." (Doc. 34 at 23, cleaned up.) Plaintiff does not allege that he was forced to go to the library, specifically, as opposed to anywhere else. Accordingly, the October 2025 encounter was not a "seizure."

### C.    Equal Protection

#### 1.    The Parties' Argument

The City argues that "[i]t remains unclear whether Plaintiff is truly advancing the selective enforcement theory" but, regardless, any such claim fails for several reasons. (Doc. 37 at 5.) First, the City argues that "Plaintiff does not meaningfully define his class or a similarly situated one." (*Id.* at 6.) "[R]eading the [TAC] liberally," the City argues that Plaintiff "seems to imply that people 'who appear unhoused' are treated differently than those 'who appear housed,'" but "this of course is not a proper definition of a class, as Plaintiff does not explain what it means to 'appear' housed or unhoused." (*Id.*) The City argues that "[i]f instead Plaintiff's comparator class are those who are, in fact, housed or unhoused, Plaintiff does not explain how he or City law enforcement could possibly know the housing status of everyone at the park" and that "[f]ailure to define the relevant classes alone requires dismissal of Plaintiff's claims." (*Id.* at 6-7.) Second, the City argues that "[e]ven assuming Plaintiff can identify the relevant classes as those who 'appear' housed or unhoused," Plaintiff has failed to allege discriminatory effect. (*Id.* at 7.) The City argues that "[o]f the four interactions Plaintiff alleges, only two involve allegations that can reasonably be read to make any sort of comparison between Plaintiff's class and another: the November 2024 interaction and the October 2025 interaction," "[b]ut neither interaction demonstrates discriminatory effect under a selective enforcement theory." (*Id.*) As for the November 2024 incident, the City argues that the TAC's allegations "fail to

the meaning of the Fourth Amendment." (Doc. 35 ¶ 67.) This is "a textbook example of the sort of conclusory, fact-free assertion that *Iqbal* forbids." *Andrich v. Kostas*, 2020 WL 377093, *5 (D. Ariz. 2020). Moreover, in paragraph 102 of the TAC, Plaintiff alleges that he "lawfully declined to be banished from the park" during the October 2025 encounter. (Doc. 35 ¶ 102.)

show discriminatory effect" because "Plaintiff fails to draw an equivalent comparison between his class and another—those 'who were also present with backpacks and belongings' is not the control group in this analysis." (*Id.*) Citing *Garber v. Flores*, 2009 WL 1649727 (C.D. Cal. 2009), the City argues that "[h]ere, too, there is no factual basis to infer that the others 'who were also present with backpacks and belongings' did not appear unhoused" and that "[t]he inference that Plaintiff asks the Court to draw—that the rangers describing the others' conduct as 'recreating' necessarily implies that the rangers targeted Plaintiff for appearing unhoused—is unreasonable and too far of a logical leap." (*Id.* at 8.) Moreover, the City argues that "as the *Garber* court recognized, the comparison between groups must be tied to the reason for enforcement," the "rangers distinguished the others' conduct by stating that they were 'recreating,'" and thus "Plaintiff was not similarly situated with the others if he was violating the ordinance and the others were 'recreating.'" (*Id.*) As for the October 2025 encounter, the City argues that "Plaintiff has not alleged that during this interaction, an ordinance was enforced against him at all." (*Id.* at 9.) And the City argues that "[e]ven if [Plaintiff] could allege enforcement of an ordinance, this interaction again shows only that the officer did not speak to others 'with backpacks and personal belongings,'" but Plaintiff was violating the camping ordinance whereas the others were not, and so "the October interaction does not show discriminatory effect either." (*Id.*) The City next argues that, "[a]t most, Plaintiff has alleged that the officer's 'selective approach' evidenced 'discriminatory treatment by law enforcement towards unhoused individuals." (*Id.*) But the City argues that "such 'general and conclusory statements' cannot sustain a claim under the selective enforcement theory." (*Id.* at 10.) Third, the City argues that "[e]ven if Plaintiff could show discriminatory effect," he has failed to allege discriminatory purpose. (*Id.*) The City argues that "the factual allegations relating to the intent of the rangers and officers with whom Plaintiff interacted are limited to the November 2024 interaction" and "[i]n none of the other interactions does Plaintiff specifically allege discriminatory intent." (*Id.*) The City also argues that "Plaintiff's other allegations of intent that relate to his interactions with law enforcement are equally

insufficient" because "[i]n essence, Plaintiff pleads that because he experienced these interactions with law enforcement and he appears unhoused, the interaction necessarily demonstrates malicious intent toward the unhoused," "[b]ut such an inference does not logically follow, and conclusory allegations like this 'will not do.'" (*Id.* at 11.)  Next, the City argues that Plaintiff's allegations about a "so-called 'Goon Squad' whose purpose was to target the homeless . . . do not suffice to show discriminatory purpose." (*Id.*)  The City also argues that "these allegations do not support the showing of a 'policy, plan, or a pervasive pattern' required to receive an injunction on a selective enforcement theory." (*Id.* at 11-12.)  The City next argues that "[c]onspicuously absent from Plaintiff's selective enforcement allegations are any facts stating that *others in his class* were affected" and that "[i]nstead, his allegations suggest that law enforcement has singled *him* out among patrons of the park." (*Id.* at 12.)  The City argues that "it is clear" that Plaintiff "is, in fact, relying on a class of one theory." (*Id.*)  The City argues that "the Court should dismiss this claim because Plaintiff raises it in contravention of" the Order Dismissing the SAC, which granted leave to amend solely to allege facts to support a "selective enforcement" theory. (*Id.*)  In the alternative, the City argues that the claim fails on the merits because "the ordinances require law enforcement to exercise significant but adequately constrained discretion" and thus, under Supreme Court and Ninth Circuit precedent, "these ordinances by their nature involve discretionary decision-making based on a vast array of subjective, individualized assessments," such that "the class of one theory does not apply." (*Id.* at 12-14, cleaned up.)

In response, Plaintiff argues that "the TAC alleges that similarly situated individuals—specifically housed individuals engaged in the same conduct—were not subjected to enforcement, supporting both discriminatory effect and discriminatory intent" and that "[a]t the pleading stage, these allegations are more than sufficient to state an Equal Protection claim." (Doc. 38 at 2-3.)  Plaintiff argues that the City's arguments fail "because the TAC plausibly alleges selective enforcement, not merely a prohibited 'class-of-one' theory, and satisfies both required elements: discriminatory effect and discriminatory

intent." (*Id.* at 8.) As for discriminatory effect, Plaintiff argues that "[t]he TAC alleges that Plaintiff was singled out for enforcement while similarly situated individuals—specifically housed individuals engaging in the same conduct—were not subjected to enforcement" and also "alleges that the officers targeted him for removal from public spaces despite the presence of others engaged in identical conduct who were allowed to remain." (*Id.* at 9.) Plaintiff argues that "[t]hese allegations identify a comparator group (housed individuals in public spaces) and assert differential treatment." (*Id.*) As for discriminatory intent, Plaintiff argues that "[t]he TAC alleges that Plaintiff was targeted because of his status and circumstances, including his perceived homelessness and presence in public spaces." (*Id.*) Plaintiff also argues that "[d]iscriminatory intent may be inferred from circumstantial evidence, including patterns of selective enforcement" and that "[t]he TAC's allegations—that Plaintiff was repeatedly singled out while others were ignored—support a reasonable inference of discriminatory intent." (*Id.* at 10.) Next, Plaintiff argues that the City "mischaracterizes" his Equal Protection claim as one brought under a "class of one" theory. (*Id.*) Specifically, Plaintiff argues that he "does not allege that he was uniquely singled out for arbitrary reasons alone; rather, he alleges that he was treated differently from a class of similarly situated individuals—namely, housed individuals using public spaces" and that "[t]his is a classic selective enforcement claim, not a pure 'class-of-one' theory." (*Id.*) Plaintiff argues that "[c]ourts distinguish between: a. Class-of-one claims based on arbitrary treatment; and b. Selective enforcement claims based on differential treatment of identifiable groups" and that his "claim falls squarely in the latter category." (*Id.*) Next, Plaintiff argues that "discretionary enforcement decisions" do not foreclose his Equal Protection claim and that the City's "position would effectively immunize all selective enforcement so long as it is labeled 'discretionary,' which is not the law." (*Id.* at 10-11.)[4] Plaintiff also argues that the City's motion "demands more detailed

---

[4]     Plaintiff appears to misunderstand the City's argument about discretionary enforcement decisions. The City argues that the enforcement of the Challenged Ordinances is discretionary, and therefore, a "class of one" Equal Protection theory is inapplicable. Plaintiff's response brief clarifies that he is *not* bringing a "class of one" Equal Protection claim and argues that discretionary enforcement does not bar his "selective enforcement"

factual allegations than required under Rule 8" and that he "is not required to identify specific comparators by name or provide statistical evidence at the pleading stage." (*Id.* at 11.) Plaintiff argues that the allegations in the TAC are sufficient to state an Equal Protection claim because he "has plausibly alleged that: a. He was treated differently than similarly situated individuals; and b. The differential treatment was motivated by an improper purpose." (*Id.*)

In reply, the City argues that "Plaintiff now makes clear that he did not intend to raise the class of one theory." (Doc. 39 at 2.) Accordingly, the City argues that "the Court should not consider Plaintiff's claim under the class of one theory, nor should it allow Plaintiff to bring a class of one claim for the reasons stated in the City's Motion." (*Id.*) As for Plaintiff's "selective enforcement" theory, the City argues that Plaintiff has failed to allege discriminatory effect because he "has not alleged that the housed individuals were engaged in the same criminalized conduct" and that "Plaintiff was not subject to enforcement for merely having 'backpacks and personal belongings.'" (*Id.*) "By alluding to the comparator group as housed individuals present with backpacks and belongings," the City argues that "Plaintiff fails to 'isolate the factor allegedly subject to impermissible discrimination'" and that "[t]his is especially so because Plaintiff fails to allege that any *other* unhoused individuals were subject to enforcement." (*Id.* at 3.) Thus, the City argues that "Plaintiff has failed to allege a similarly situated class against which the enforcement actions could be compared, and in doing so, Plaintiff has failed to allege discriminatory effect." (*Id.*) Next, the City argues that "Plaintiff has also failed to allege discriminatory purpose" because his "sole argument on this point is that discriminatory intent may be inferred from patterns of selective enforcement and that he was repeatedly 'singled out,'" but he "cites no case that supports this argument." (*Id.*) "Because Plaintiff has not adequately alleged discriminatory effect or discriminatory purpose," the City argues that "he cannot prevail under the selective enforcement theory" and "[t]he Court should dismiss [his] Fourteenth Amendment claim with prejudice." (*Id.* at 4.)

---

claim.

- 20 -

2.   Analysis

a.   **Class Of One**

Plaintiff may not proceed on a "class of one" Equal Protection theory for several reasons.  First, to the extent the TAC asserts an Equal Protection claim under a "class of one" theory, it exceeds the limited scope of leave to amend granted in the Order Dismissing the SAC.  *See, e.g.*, *McDonough v. Bidwill*, 2025 WL 2673966, *5 (D. Ariz. 2025) ("Courts routinely dismiss or strike newly added claims where the addition of such claims exceeds the scope of leave to amend that was previously authorized."); *Strifling v. Twitter Inc.*, 2024 WL 54976, *1 (N.D. Cal. 2024) ("The amended complaint plainly exceeds the scope of this Court's dismissal order, which reads, '[plaintiffs] may file an amended complaint within twenty-one days of this order *solely* to cure the deficiencies identified by this order.' This language permits neither the addition of new parties nor the addition of new claims but rather permits [plaintiffs] to amend their allegations in a manner sufficient to state the pleaded claims.") (citations omitted); *Crane v. Yarborough*, 2012 WL 1067965, *13 n.14 (C.D. Cal. 2012), *report and recommendation adopted*, 2012 WL 1067956 (C.D. Cal. 2012) ("[I]t would be appropriate to strike plaintiff's First Amendment retaliation claim because the addition of such claim which has been raised for the first time in the Second Amended Complaint exceeds the scope of the leave to amend granted in the November 30 Order . . . ."); *DeLeon v. Wells Fargo Bank, N.A.*, 2010 WL 4285006, *3 (N.D. Cal. 2010) ("[W]here leave to amend is given to cure deficiencies in certain specified claims, courts have agreed that new claims alleged for the first time in the amended pleading should be dismissed or stricken."); *PB Farradyne, Inc. v. Peterson*, 2006 WL 2578273, *3 (N.D. Cal. 2006) (striking new theory of liability alleged in the third amended complaint because it was "outside the scope of the leave to amend granted" when the court dismissed the second amended complaint).

The Order Dismissing the SAC held that "[a]lthough the SAC d[id] not assert a standalone claim under the Equal Protection Clause," "[i]n light of Plaintiff's *pro se* status," "the Court [would] consider the SAC as a whole to determine whether it states such

a claim." (Doc. 34 at 42.) The Court observed that it appeared Plaintiff believed he had stated an Equal Protection claim under a "selective enforcement" theory based on "perceived housing status." (*Id.* at 43.) The Court further observed, in a footnote, that Plaintiff was "not pursuing" an Equal Protection claim under a "class of one" theory. (*Id.* at 42 n.16.) This footnote was not an invitation for Plaintiff to attempt to assert a new "class of one" Equal Protection claim in the TAC. *Cf. McDonough*, 2025 WL 2673966 at *5 ("The Court did not . . . announce a 'deficiency' in the way the Family Plaintiffs pleaded their claims or . . . suggest the viability of this cause of action . . . ."). Indeed, after concluding that the SAC had failed to state an Equal Protection claim under a "selective enforcement" theory, the Order Dismissing the SAC granted limited leave to amend "to allege additional facts intended to support an Equal Protection claim *under a selective enforcement theory.*" (*Id.* at 45, emphasis added.) The Order Dismissing the SAC separately stated that "Plaintiff may . . . allege *additional facts* to support the assertion of an Equal Protection claim *consistent with this order.*" (*Id.* at 45, emphasis added.) The Order Dismissing the SAC did not permit Plaintiff to assert a new legal theory to support his Equal Protection claim.

Second, at any rate, Plaintiff's response to the motion to dismiss explicitly clarifies that he is not pursuing an Equal Protection claim under a "class of one" theory and is instead proceeding under a "selective enforcement" theory:

> [The City] argues that Plaintiff improperly asserts a "class of one" claim. This mischaracterizes the TAC. Plaintiff does not allege that he was uniquely singled out for arbitrary reasons alone; rather, he alleges that he was treated differently from a class of similarly situated individuals—namely, housed individuals using public spaces. *This is a classic selective enforcement claim, not a pure "class-of-one" theory.* Courts distinguish between: a. Class-of-one claims based on arbitrary treatment; and b. Selective enforcement claims based on differential treatment of identifiable groups. *Plaintiff's claim falls squarely in the latter category.*

(Doc. 38 at 10, cleaned up, emphases added.)[5]

---

[5]    Although Plaintiff's request to file a surreply has been denied, the Court notes that it has reviewed Plaintiff's proposed surreply lodged at Doc. 41, which attempts to reverse course from Plaintiff's response brief and argue that the TAC does contain a "class of one"

Third, even if Plaintiff had properly sought to amend the complaint to assert an Equal Protection claim under a "class of one" theory, such amendment would be futile.  In *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591 (2008), the Supreme Court explained that "an equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called 'class of one.'" *Id.* at 601.  The Court further noted that such claims have arisen in the context of "the government's regulation of property" and "property assessment and taxation schemes," because "[w]e expect such legislative or regulatory classifications to apply 'without respect to persons,' to borrow a phrase from the judicial oath." *Id.* at 602.  In contrast, the Court explained that:

> [t]here are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments.  In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted.  In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.
>
> Suppose, for example, that a traffic officer is stationed on a busy highway where people often drive above the speed limit, and there is no basis upon which to distinguish them.  If the officer gives only one of those people a ticket, it may be good English to say that the officer has created a class of people that did not get speeding tickets, and a "class of one" that did.  But assuming that it is in the nature of the particular government activity that not all speeders can be stopped and ticketed, complaining that one has been singled out for no reason does not invoke the fear of improper government classification.  Such a complaint, rather, challenges the legitimacy of the underlying action itself—the decision to ticket speeders under such circumstances.  Of course, an allegation that speeding tickets are given out on the basis of race or sex would state an equal protection claim, because such discriminatory classifications implicate basic equal protection concerns.  But allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason,

Equal Protection claim. (Doc. 41 at 2.)  But a party cannot, via an improperly filed surreply, take the opposite position from that taken in a properly filed response brief.

would be incompatible with the discretion inherent in the challenged action. It is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized.

*Id.* at 603-04. Similarly, in *Towery v. Brewer*, 672 F.3d 650 (9th Cir. 2012), the Ninth Circuit held that "[t]he class-of-one doctrine does not apply to forms of state action that by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments," and "[a]bsent any pattern of generally exercising the discretion in a particular manner while treating one individual differently *and* detrimentally, there is no basis for Equal Protection scrutiny under the class-of-one theory." *Id.* at 660-61 (cleaned up).

The Challenged Ordinances require discretionary decisions by those enforcing them. Indeed, MCC § 6-10-4(V), which prohibits "camping" in public parks, incorporates the definition of "camping" in MCC § 6-10-2. That "camping" definition supplies several indicia of camping for officers enforcing the regulation to consider in their discretion and also provides that "[a]n activity shall constitute camping *when it reasonably appears, in light of all the circumstances*, the person, in conducting the activity, are in fact using the area for the purposes of living accommodations." MCC § 6-10-2 (emphasis added). The definition of camping under MCC § 6-1-23, which prohibits "Urban Camping," is nearly identical. In other words, officers are given discretion—restrained by the camping indicia—to determine whether a person's activities constitute "camping" and to also determine whether "it reasonably appears, in light of the all the circumstances" that the person is "using the area for the purposes of living accommodations."

What's more, the TAC does not adequately allege "any *pattern* of" rangers "generally exercising the discretion in a particular manner while treating [Plaintiff] differently *and* detrimentally." *Towery*, 672 F.3d at 660-61 (first emphasis added). At most, the TAC alleges that during the November 2024 encounter, rangers accused Plaintiff of violating MCC § 6-10-4(V) because he had more than two backpacks with him in the park, and when "Plaintiff asked the rangers why he was being singled out while other individuals in the park—who were also present with backpacks and belongings—were not

- 24 -

being questioned or ordered to leave," the "rangers responded that the others were 'recreating.'" (Doc. 35 ¶¶ 37, 40.) As an initial matter, it's unclear based on the allegations in the TAC whether these other individuals had, as Plaintiff did, more than two backpacks per person. The TAC only alleges that others in the park "who were also present with backpacks and belongings" were not approached. (*Id.* ¶ 40.) If the other individuals did not have more than two backpacks per person, they would not be similarly situated to Plaintiff.

At any rate, this encounter suggests that the rangers treated Plaintiff differently because he had more than two backpacks and was perceived as not "recreating," whereas others in the park were perceived as "recreating." And even if the allegations in the complaint are interpreted that Plaintiff, too, was "recreating," this *singular incident* of an officer declining to approach other parkgoers who were "recreating" with backpacks does not support that the City has a "pattern" of "generally" not enforcing the Challenged Ordinances against those who possess backpacks and are recreating.

As for the October 2025 encounter, the TAC alleges that an officer approached Plaintiff and stated: "this is not a place for all your stuff" and "you should go to the library." (Doc. 35 ¶ 56.) But the TAC also alleges that when Plaintiff asked what ordinance he was violating, the officer did not identify any law and did not (and in fact, refused to) issue Plaintiff a citation. (*Id.* ¶ 57.) It's unclear how this encounter could be construed as an "enforcement" of the Challenged Ordinances. At most, it shows that an officer suggested that Plaintiff "should" leave the park and go to the library. Thus, the allegation that the same officer "ignored other park patrons . . . who were also present with backpacks and personal belongings" is of no moment because the officer was not, according to the allegations in the TAC, actually enforcing the Challenged Ordinances.[6]

---

[6] The TAC also alleges, in conclusory fashion, that the City "ha[s] engaged in a persistent and ongoing pattern of conduct that selectively and arbitrarily targets Plaintiff for harassment, citation, and exclusion from public spaces, while intentionally ignoring housed individuals who are similarly situated and engaged in identical, lawful conduct." (Doc. 35 ¶ 90.) But this type of conclusory allegation, standing alone, is insufficient for a class-of-one claim. The TAC then alleges that this "pattern" includes the November 2024 incident (which, as described above, is insufficient, at least standing alone, to show such a pattern) and a January 2025 incident—mentioned nowhere else in the TAC—in which a

- 25 -

*Garber* is analogous and persuasive. There, "the gravamen of plaintiff's claims [was] that defendants ha[d] engaged in a 'pattern and practice' of discriminating against the homeless and 'aliens,' by 'harassing' them, 'ticketing, arresting, and prosecuting them.'" 2009 WL 1649727 at *2. The court construed the allegations in the complaint "as purporting to state a claim under the Equal Protection Clause of the Fourteenth Amendment." *Id.* at *10. The court held that "to the extent that plaintiff may be purporting to base an equal protection claim on the discretionary acts of officers in arbitrarily singling out plaintiff to ticket in situations where they failed to ticket other individuals, such allegations cannot give rise to a federal constitutional claim." *Id.* at *11. Citing *Engquist*, the court held:

> In situations where an officer must select which of many vehicles to ticket, the allegation that one has been singled out for no reason does not give rise to an equal protection claim because allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise. Here, plaintiff's allegations that officers have repeatedly singled him out to ticket in situations in which they could have cited other individuals is precisely the type of conduct that cannot give rise to a claim under the Equal Protection Clause.

*Id.* at *12 (cleaned up). So too here, Plaintiff's allegations that he was approached and/or cited by officers and rangers when others in the park could have been, but were not, also cited fails to support an Equal Protection claim under a "class of one" theory.

#### b.    **Selective Enforcement**

Where, as here, "there is no suspect class at issue," a plaintiff may rely on a "selective enforcement" theory to state an Equal Protection claim. *People of City of Los Angeles Who Are Un-Housed v. Garcetti*, 2023 WL 8166940, *11 (C.D. Cal. 2023). Under

---

ranger allegedly told Plaintiff to maintain an "erect posture," "a standard" the TAC broadly alleges is "not applied to any housed person in a City park." (*Id.* ¶ 91.) Again, these types of conclusory allegations are insufficient to show that the City has a pattern of exercising its discretion in enforcing the Challenged Ordinances in one way but treated Plaintiff, specifically, differently and detrimentally. Other parts of the TAC contain similar conclusory allegations that "Plaintiff was and is similarly situated to countless other individuals in Mesa who use public parks while possessing personal belongings" and that the City "treated Plaintiff differently from these similarly situated individuals." (*Id.* ¶ 105-06.) But again, *Iqbal* requires more than these types of conclusory allegations.

this theory, "if a plaintiff alleges that the law is selectively enforced against certain groups of people and not others, then a plaintiff can show that the rational basis for enforcement is a pretext for an impermissible motive." *Id.* (cleaned up). "To show selective enforcement, a plaintiff 'must demonstrate that enforcement had a discriminatory effect and the police were motivated by a discriminatory purpose.'" *Bilodeau v. City of Medford*, 2024 WL 1470516, *9 (D. Or. 2024), *report and recommendation adopted*, 2024 WL 1462328 (D. Or. 2024) (quoting *Rosenbaum v. City & Cnty. of San Francisco*, 484 F.3d 1142, 1152 (9th Cir. 2007)). "Further, plaintiffs seeking to enjoin enforcement must demonstrate that the selective enforcement is part of a 'policy, plan, or a pervasive pattern.'" *Id.* (cleaned up).

In the Order Dismissing the SAC, the Court concluded that the SAC was deficient because it "d[id] not adequately allege a discriminatory effect." (Doc. 34 at 43.) As the Order Dismissing the SAC explained: "The standard for proving discriminatory effect is a demanding one. Yet, to state a claim, [a plaintiff] need only allege some facts, either anecdotal or statistical, demonstrating that similarly situated defendants could have been prosecuted, but were not." (*Id.* at 43-44, quoting *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 920 (9th Cir. 2012) (en banc)). The Order Dismissing the SAC observed that, "at most," the SAC alleged that during the November 2024 encounter, "Plaintiff asked rangers who approached him 'why he was being singled out while others in the park were not questioned'" but noted that "the SAC d[id] not allege that other non-homeless people in the park were engaged in the same activities in the park as Plaintiff yet avoided enforcement," and "[t]he SAC therefore fail[ed] to allege sufficient facts to support a selective enforcement claim." (Doc. 34 at 43-44.) Although now a closer call, the TAC continues to be deficient in this respect.

Only two of the specific encounters addressed in the TAC—the November 2024 encounter and the October 2025 encounter—come close to addressing how others have been treated by the City under the Challenged Ordinances. As for the November 2024 encounter, the TAC, like the SAC, alleges that Plaintiff asked the rangers who approached

him "why he was being singled out while other individuals in the park . . . were not being questioned or ordered to leave." (Doc. 35 ¶ 40.) The TAC adds that these other individuals in the park were "housed" and "were also present with backpacks and belongings." (*Id.* ¶¶ 40, 91.) But the TAC doesn't actually allege that these other parkgoers engaged in the *same conduct* as Plaintiff. The TAC alleges that, during this encounter, the "rangers told plaintiff that having just one or two backpacks would be alright, but since he had more than that, it constituted a violation of the ordinance." (*Id.* ¶ 37.) Although the TAC alleges that other park patrons had "backpacks and belongings" (*id.* ¶¶ 40, 91), it does not allege that these other individuals had *more than two* backpacks per person, as Plaintiff did. Others present in the park with "backpacks" or "personal belongings" are not similarly situated to Plaintiff unless they had more than two backpacks per person—because that is the reason that the rangers gave for approaching Plaintiff and for believing he was violating the Challenged Ordinances. *Cf. Garber*, 2009 WL 1649727 at *10 (Equal Protection claim based on homelessness failed where the plaintiff alleged that other vehicles left in the same location as his were not ticketed "but plaintiff was cited for a missing headlight and a missing license plate, not for parking his vehicle in the location where he was ticketed").

As for the October 2025 encounter, it's not clear that this was even an "enforcement" of the Challenged Ordinances. "Enforcement may be shown through a variety of actual or threatened arrests, searches and temporary seizures, citations, and other coercive conduct by the police." *Lacey*, 693 F.3d at 920. *Cf. Farrell v. Dep't of Safety & Permits*, 2026 WL 2024458, *6 (E.D. La. 2026) (no Equal Protection violation under selective enforcement theory where there was "not an enforcement action" and no "enforcement of an ordinance"). The TAC alleges that an officer approached Plaintiff and simply told him "this is not a place for your stuff" and "you should go to the library." (Doc. 35 ¶¶ 56-57.) But when asked by Plaintiff what ordinance he was violating, the officer did not state that Plaintiff was violating any law or ordinance. (*Id.*) The officer also "refused to issue a citation" and told Plaintiff he "had to leave the park 'simply because she said to.'" (*Id.*) Nothing about this encounter comes close to an actual or threatened arrest,

search or seizure, citation, or coercive conduct by the officer.  Thus, the fact that others were not approached is of no moment.

Beyond these two specific encounters,[7] the TAC contains only generalized and conclusory allegations that the Challenged Ordinances are enforced against homeless people but not against housed people.  (*See, e.g.*, Doc. 35 ¶ 88 ["[The City] . . . intentionally and irrationally discriminates against Plaintiff based on his unhoused status, thereby violating his right to equal protection of the laws."]; *id.* ¶ 90 ["[The City] ha[s] engaged in a persistent and ongoing pattern of conduct that selectively and arbitrarily targets Plaintiff for harassment, citation, and exclusion from public spaces, while intentionally ignoring housed individuals who are similarly situated and engaged in identical, lawful conduct."]; *id.* ¶ 97 ["[T]he City[] [has a] *de facto* policy of targeting individuals who appear unhoused."]; *id.* ¶ 98 ["The pattern of selective enforcement against Plaintiff has continued throughout this litigation, demonstrating that the City's discriminatory practices are systemic and present a credible threat of future harm."]; *id.* ¶¶ 105-06 ["Plaintiff was and is similarly situated to countless other individuals in Mesa who use public parks while possessing personal belongings.  These individuals include students, tourists, picknickers, and families.  The only material difference between Plaintiff and these comparators is that Plaintiff is unhoused.   [The City] intentionally and systematically treated Plaintiff differently from those similarly situated individuals . . . ."].)   These generalized and conclusory allegations fail to satisfy the requirements of *Iqbal*.  *People of City of L.A. Who Are Un-Housed*, 2023 WL 8166940 at *12 ("Plaintiffs . . . further allege that 'defendants selectively enforced their subject ordinances against homeless people and not against non-

---

[7]     Paragraph 91 of the TAC makes fleeting reference to a January 2025 incident that is not mentioned anywhere else in the TAC.  (Doc. 35 ¶ 91.)  The TAC alleges that during this incident, "a City ranger harassed Plaintiff and ordered him to maintain an 'erect posture,' effectively criminalizing the act of closing one's eyes or appearing to rest, a standard not applied to any housed person in a City park" and that after this encounter, the City "unlawfully banished Plaintiff [from] a pubic park in the City . . . for one month, a punitive and arbitrary exclusion not imposed on housed individuals cited for minor municipal infractions." (*Id.*)  These allegations, however, are vague and conclusory, and they fail to identify a comparator *engaged in the same conduct as Plaintiff* who was not subjected to the same treatment.

homeless people' . . . . But beyond those general and conclusory statements, Plaintiffs fail to allege an instance where a housed individual within a cleaning zone, or in obstruction of a sidewalk or street, was not subject to the same ordinance or restrictions. Accordingly, Plaintiffs fail to reach the level of specificity to survive the motion to dismiss stage.").

Last, absent from the TAC are any allegations that other homeless individuals have been targeted by the City's enforcement of the Challenged Ordinances. This too supports dismissal of Plaintiff's Equal Protection claim under a "selective enforcement" theory. *See, e.g.*, *Perry v. Colorado*, 2023 WL 1967141, *14 (D. Colo. 2023), *report and recommendation adopted sub nom.*, *Perry v. City of Fort Collins*, 2023 WL 2583112 (D. Colo. 2023), *aff'd*, 2024 WL 508597 (10th Cir. 2024) ("[Plaintiff] has not alleged any facts which demonstrate that the City cited other homeless individuals with violations of its camping ordinance because of their homelessness. Thus, the Court finds that Plaintiff fails to allege an equal protection claim with respect to the camping ordinance.").

### D.    Plaintiff's Notices Of Supplemental Fact

Plaintiff has filed several "notices of supplemental fact" describing additional encounters with officers while in City parks. (Docs. 42, 48, 50.) These "notices" are both procedurally improper and fail, on the merits, to support Plaintiff's claims.

#### 1.    Procedural Issues

It appears, at least based on another of Plaintiff's filings in this case, that he believes that because the incidents described in these notices "occurred after the original complaint was filed," he may raise them via "notices of supplemental fact" under Rule 15(d) of the Federal Rules of Civil Procedure and that the Court must "accept" the "factual assertions" within these notices "as true." (Doc. 47 at 2-3.)

That is incorrect. Rule 15(d) provides:

> *On motion and reasonable notice*, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

- 30 -

*Id.* (emphasis added).  Plaintiff has not moved to serve a supplemental pleading—thus, his "notices" are procedurally improper under Rule 15(d).  *Cf. Mai v. Safeco Ins. Co. of Am.*, 2026 WL 2059088, *6 (N.D. Cal. 2026) ("[U]nlike Rule 15(a), Rule 15(d) expressly requires a motion seeking leave to supplement, and Plaintiffs have not filed one.").

2.    Merits

Even if the procedural impropriety of these "notices" could be overlooked in light of Plaintiff's *pro se* status and the general rule that the supplementation of pleadings under Rule 15(d) is "a tool of judicial economy and convenience" that is "favored," *Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988), none of the factual allegations within them would alter the dismissal analysis in this order.

a.    **May 11, 2026 Notice**

Plaintiff's May 11, 2026 notice alleges the following:

> On or about May 9th, 2026, Plaintiff was present at a public park in the City . . . .  Plaintiff was lying down on a bench at a picnic table under a ramada. Plaintiff had no bedding, tent, or camping equipment deployed.  His belongings remained secured on his bicycle and were not spread out.

> [City] police officers approached Plaintiff and informed him that he was violating the City's anti-camping ordinance by "sleeping" in the park.

> Plaintiff responded by informing the officers that, in this very litigation, [the City] ha[s] expressly represented to this Court that "sleeping" alone does not constitute a violation of the ordinance.

> . . .

> During this encounter, an officer demanded Plaintiff's identification. Plaintiff paused momentarily, as he was aware that he is not required to provide identification absent lawful detention supported by reasonable suspicion of criminal activity.

> In response, the officer escalated the encounter, stating:

> "You are now detained, you were sleeping at a public park . . . . . give me your ID or you will be arrested."

> This detention was predicated solely on the alleged act of "sleeping" . . . .

(Doc. 42 at 1-2.)

Even accepting these factual allegations as true, they do not constitute a "seizure"

- 31 -

under the Fourth Amendment. Telling Plaintiff that he was "detained" is not a show of authority unless and until Plaintiff submits to that authority. *See, e.g.*, *United States v. Jeffers*, 2024 WL 5375814, *5 (E.D. Tex. 2024), *report and recommendation adopted*, 2025 WL 1239318 (E.D. Tex. 2025) (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)) ("It was only after Jeffers, stepping off the elevator, told the officers that he was staying with his 'coworker, Frank Browning,' that the officers told him to 'stop,' 'come here,' 'don't run,' and 'you're being detained.' That was the first moment the officers ordered Jeffers to do anything. Jeffers did not immediately comply but backed away from the officers down the hall until they grabbed his arms. Because 'there is no seizure without actual submission,' Jeffers was not seized for Fourth Amendment purposes until the officers grabbed his arms, preventing him from continuing down the hall."). Plaintiff's notice explicitly states that Plaintiff refused to comply with the officer's direction to provide identification, and it says nothing about whether, after he was told he was being detained, he nevertheless attempted to leave and was restrained.[8]

Nor do these allegations, accepted as true, alter the Equal Protection dismissal analysis. Plaintiff's notice makes only generalized and conclusory statements that Plaintiff was singled out, which are insufficient under *Iqbal*. (*See, e.g.*, Doc. 42 at 3 ["Plaintiff continues to be singled out for enforcement based on his status and appearance as an unhoused individual. The enforcement described herein is consistent with Plaintiff's previously alleged pattern of selective enforcement."]; *id.* ["This incident is not an isolated occurrence but part of a continuing pattern."].) Indeed, the notice says nothing about how others who sleep in City parks have been treated.

b.      **June 8, 2026 Notice**

Plaintiff's June 8, 2026 Notice alleges the following:

On or about June 8, 2026, Plaintiff was present at a public park in the City . . . . Plaintiff was lying down on the bench of a picnic table located under a

---

[8]      Plaintiff does not allege in this notice that he was cited for violating the Challenged Ordinances; however, he does attach a copy of a citation issued against him for violating MCC § 6-10-4(V). (Doc. 42-1.) But as explained in the Order Dismissing the SAC (Doc. 34 at 24-25), the issuance of a citation is not a "seizure" under the Fourth Amendment.

ramada.  Two Mesa park rangers approached Plaintiff.  One ranger initiated the contact by stating:

"Here's the reason for the contact.  You're sleeping at the park, ok, [it's] considered camping.  Ok?"

Plaintiff immediately responded, "It is not."  The ranger then dismissed Plaintiff's attempt to assert his rights, stating:

"We're not even going to go back and forth.  I just need you to sit up and remain awake at the park, ok?"

No citation was issued.

(Doc. 48 at 2.)

This encounter does not constitute a seizure.  Plaintiff does not allege that he complied with the officer's commands or that he was restrained in any way.

This encounter also does not alter the Equal Protection dismissal analysis.  Again, it says nothing about how the Challenged Ordinances have been applied to others sleeping in City parks.  At most, Plaintiff's notice states, again in conclusory fashion, that "[t]his incident demonstrates a continuing pattern of arbitrary enforcement" and that City officers "are targeting individuals for the mere act of resting in a public park." (*Id.* at 3.)  This is insufficient under *Iqbal*.

### c.   **June 19, 2026 Notice**

Plaintiff's June 19, 2026 notice alleges the following:

On June 18, 2026, Plaintiff was present at a City of Mesa park occupying approximately one-half of a picnic table.  Plaintiff possessed personal belongings, including backpacks and food.

Two [City] Park Rangers approached Plaintiff and initiated contact.  One of the rangers identified himself as Ranger Mitchell (last name unknown).

Plaintiff requested that the rangers not approach him absent lawful reason for doing so.  Plaintiff then allowed Ranger Mitchell an opportunity to explain the basis for the contact.

Ranger Mitchell stated that Plaintiff was being contacted because Plaintiff possessed more items in the park than were necessary for recreation and that such conduct constituted camping.

Plaintiff informed Ranger Mitchell that Plaintiff disputed that interpretation of the ordinance and explained that Plaintiff possessed written statements

- 33 -

from the City and its attorneys indicating that possession of belongings alone does not constitute camping.

Plaintiff asked Ranger Mitchell where the ordinance stated that possessing more belongings than necessary for recreation constituted camping.

Ranger Mitchell responded that the ordinance definitions included camping and maintained that possession of more belongings than necessary for recreation constituted camping.

During the encounter, Ranger Mitchell further stated that even merely possessing camping paraphernalia constituted camping.

Plaintiff informed Ranger Mitchell that [MCC] § 6-10-2 does not state that possessing more belongings than necessary for recreation constitutes camping.

. . .

Ranger Mitchell nevertheless maintained that Plaintiff was violating the ordinance by "having more things than necessary to recreate" and that mere possession of camping paraphernalia was a violation of the ordinance.

Plaintiff explained that the ordinance does not contain such language and that the interpretation advanced by Ranger Mitchell appeared inconsistent with positions advanced by [the City] in this litigation.

Ranger Mitchell responded that his interpretation reflected the manner in which Mesa had instructed and trained rangers to interpret and enforce the ordinance.

No citation was issued during the encounter.

(Doc. 50 at 2-4.)

This encounter does not represent a seizure. At most, the allegations show that Plaintiff engaged in an argument with a City park ranger about what conduct the Challenged Ordinances prohibit. Plaintiff does not allege that the ranger actually commanded him to do anything, that he complied with any commands by the ranger, or that he was restrained in any way.

This encounter also does not alter the Equal Protection analysis. It says nothing about how others, other than Plaintiff, were treated.

IV.    <u>Leave To Amend</u>

The City argues that Plaintiff's claims should be dismissed with prejudice (Doc. 37

at 1), and Plaintiff responds that he should be granted leave to amend because he has not acted in bad faith, amendment would not be futile, and there has been no repeated failure to cure deficiencies (Doc. 38 at 14-16).

The rule in the Ninth Circuit is that "[a] district court should not dismiss a pro se complaint without leave to amend unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012) (cleaned up). "[B]efore dismissing a pro se complaint the district court must provide the litigant with notice of the deficiencies in his complaint in order to ensure that the litigant uses the opportunity to amend effectively." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992), as amended (May 22, 1992).

In the Order Dismissing the SAC, the Court specifically instructed Plaintiff regarding the deficiencies in the SAC and granted Plaintiff limited leave to amend "to plead additional facts to support that he was 'seized' under the Fourth Amendment" and "to allege additional facts intended to support an Equal Protection claim under a selective enforcement theory." (Doc. 34 at 45.) The Court further instructed that any "changes shall be limited to attempting to the cure the deficiencies [with Plaintiff's Fourth Amendment claim] identified in this order" and "alleg[ing] additional facts to support the assertion of an Equal Protection claim consistent with this order." (*Id.*) Plaintiff has failed to cure those deficiencies in the TAC, and the Court concludes that Plaintiff would not be able to cure those same deficiencies if given yet another opportunity to do so. *Ferdik*, 963 F.2d at 1261 (affirming dismissal with prejudice where district court had instructed *pro se* plaintiff regarding deficiencies in prior order dismissing claim with leave to amend); *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint."). Thus, the Court will dismiss the TAC without leave to amend.

…

…

…

Accordingly,

**IT IS ORDERED** that:

1. The City's motion to dismiss (Doc. 37) is **granted**.

2. Plaintiff's motion for leave to file a surreply (Doc. 40) is **denied**.

3. Plaintiff's motion to stay (Doc. 43) is **denied as moot**.

4. The Clerk shall enter judgment accordingly and terminate this action.

Dated this 6th day of August, 2026.

Dominic W. Lanza
United States District Judge